**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MARY E. ISRAEL,

        Plaintiff,

vs.                                                                          No. CIV 08-0339 JB/LFG

JARRET I. GLASSCOCK, individually and
as personal representative for the Estate of
Keith C. Glasscock,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

      **THIS MATTER** comes before the Court on the Defendant's Motion for Judgment on the

Pleadings and/or Preliminary Relief, filed August 22, 2008 (Doc. 39).  The Court held a hearing on

October 28, 2008.[1]  The primary issues are: (i) whether the Court should exclude Plaintiff Mary E.

Israel's affidavit; (ii) whether the Court should grant judgment in favor of Defendant Jarret I.

Glasscock on Count 3 of the Amended Complaint; and (iii) whether the Court should enter a

preliminary injunction permitting Jarret Glasscock to peacefully regain possession of the property

that is at the heart of this case and at which Israel currently resides.  Because Israel's affidavit refers

to matters outside the pleadings, the Court will not consider the affidavit in deciding whether to

grant judgment to Jarret Glasscock.  The Court will not exclude the affidavit, however, and will use

it when deciding whether to grant injunctive relief.  Because the contracts involved in this case are

ambiguous, the Court will not grant judgment to Jarret Glasscock.  Additionally, Jarret Glasscock

has failed to meet the four-part test for the issuance of preliminary relief, so the Court will not grant

_____

      [1] Although the Court heard argument on the request for preliminary relief, the only evidence
the Court received at the hearing was Israel's response to a request for admission.  <u>See</u> Exhibit to
Clerk's Minutes, Request for Admission No. 22, filed October 28, 2008 (Doc. 66).

an injunction.  The Court will therefore deny the motion.

## FACTUAL BACKGROUND

A piece of real estate in Santa Fe County, New Mexico is at the heart of this dispute.  The land was the subject of a complicated series of deals and negotiations between the now-deceased Keith C. Glasscock and Israel.  Israel is currently living on the disputed property.  She contends that she has a right to remain on the land and that Jarret Glasscock, Keith Glasscock's grandson, is seeking to unlawfully remove her and is also failing to abide by a contract under which she was to buy the disputed property.  Jarret Glasscock contends that Israel has no right to remain and that the alleged contract is void and unenforceable.

Jarret Glasscock's motion includes both a request for judgment on the pleadings and a request for injunctive relief.  The Court must scrutinize only the pleadings for the motion for judgment on the pleadings, but may look at evidence outside the pleadings to determine the motion for injunctive relief.  The majority of the facts that the Court lays out are derived from the pleadings, including several contracts incorporated by reference, and the Court must assume that Israel's factual allegations are true for purposes of judgment on the pleadings.  The only evidence from outside the pleadings that the parties have presented for the injunctive relief issue are Israel's affidavit and Israel's response to a request for admission.

The real property that is the subject of this dispute is located on West Alameda Street ("Alameda property").  <u>See</u> First Amended Complaint ¶ 6, at 2, filed August 7, 2008 (Doc. 31). Israel has lived on the Alameda property since 1999, when she and her mother purchased the property. <u>See</u> <u>id.</u> ¶ 8, at 2.  In June 2003, Israel and Keith C. Glasscock entered into a Memorandum of Understanding Regarding Ocamora Ranch Purchase ("MOU").  <u>See</u> First Amended Complaint ¶ 10, at 2; Exhibit 2 to Notice of Filing of State Court Record, MOU (dated June 13, 2003)(Doc. 9-

2).  At the time the parties entered into the MOU, Keith Glasscock owned a ranch located near Ocate, New Mexico (the "Ocamora Ranch").  The basic premise of the MOU was that Israel would purchase the Ocamora Ranch and that Keith Glasscock would buy the Alameda property.

Under the MOU, Israel was to purchase the Ocamora Ranch for two-million dollars.  Israel was to remain on the Alameda property, rent-free, with the ability to repurchase the property if she did not buy the Ocamora Ranch.  See First Amended Complaint ¶ 11, at 2.  Israel and Keith Glasscock agreed that Israel retained a financial interest in the Alameda property, that she would make improvements to the property, that she would be responsible for many of the costs of those improvements and other expenses, and that, when the property was sold, she would receive part of the property's equity.  See First Amended Complaint ¶ 12, at 2.

Page 1 of the MOU states: "**Life Estate.**  Keith Glasscock is hereby granted a life estate in the Ranch so that he may remain on the ranch until his death or until such time as he chooses to relocate.  Israel may remain in her home until that time, unless other mutual agreements are reached."  MOU at 1 (bolded in original).  Page 2 of the MOU states, concerning the Alameda property:

> Israel is to remain living in the main house on said property as caretaker and property manager, without charge, until such time said property is sold.  Israel retains the right to buy back her property, by paying Glasscock all amounts advanced by him.  Israel shall have the right to pre-pay the Ranch debt without penalty.

MOU at 2.  Jarret Glasscock contends that the MOU was later terminated, based upon a response to a request for admission stating: "The MOU permitted the parties to terminate the agreement; the agreement was terminated, relieving plaintiff of her obligations thereunder."  Exhibit to Clerk's Minutes, Request for Admission No. 22, filed October 28, 2008 (Doc. 66).

In 2003, Israel conveyed the Alameda property to Keith Glasscock, who assumed the

mortgage on the property.  See First Amended Complaint ¶ 9, at 2.  Keith Glasscock agreed to pay Israel a second mortgage of approximately $100,000.00, and a mortgage instrument in favor of Israel was recorded with Santa Fe County.  See id.  In reliance upon the MOU, Israel made significant improvements to the property.  See First Amended Complaint ¶ 13, at 3.  When Keith Glasscock sought to refinance his mortgage, Israel released her second mortgage of approximately $100,000.00.  See id. ¶ 14, at 3.  Part of the consideration for Israel's release of the second mortgage was Keith Glasscock's agreement that Israel could repurchase the property in the future.  See id. ¶ 14, at 3.

Around April 2005, Keith Glasscock informed Israel that a third party had approached him about buying the Ocamora Ranch.  See id. ¶ 15, at 3.  Israel consented to the sale of the Ocamora Ranch to the third party.  See id.  At the same time, Keith Glasscock asked Israel if she wanted to repurchase the property.  See id.  Israel told Keith Glasscock that she wanted to repurchase the property.  See id. ¶ 16, at 3.  Keith Glasscock proposed that they buy land to enlarge the lot size, and then divide the property into multiple lots, selling one of the vacant lots to satisfy the mortgage.  See id.  After Keith Glasscock sold the ranch to a third-party, Israel and Keith Glasscock agreed that she would buy back the Alameda property.  Israel and Keith Glasscock agreed that she would continue living in the house on the property while they completed the buy-back.  See Affidavit of Mary Israel ¶ 2, at 1 (executed September 4, 2008)(Doc. 42-2)("Israel Aff.").

In 2006, Keith Glasscock and Israel agreed that they would try to split the Alameda property into up to three parcels under the county regulations governing family-land transfers.  See First Amended Complaint ¶ 17, at 3.  Keith Glasscock would make a family-land transfer to his grandson, Jarret Glasscock, and would sell Israel the improved parcel containing the house and guesthouse.  See id.  The unimproved property would be sold, and the "refinanced mortgage" satisfied from this

sale amount.  As Keith Glasscock conceived the idea, Israel would handle the family-land transfer and sell the resulting unimproved parcel.  See id.

Israel and Keith Glasscock jointly contacted several attorneys to work on the necessary agreements.  See id. ¶ 18, at 3.  During discussions with these attorneys, Keith Glasscock reiterated his intention to transfer the improved property to Israel.  See id. ¶ 19, at 4.  In 2007, they met with Bob Worcester, an attorney, about drafting an agreement to allow Israel to repurchase the Alameda property and also about drafting powers of attorney to allow Israel to coordinate the family-land transfer.  See id. ¶ 20, at 5.

Around September 17, 2007, Keith Glasscock and Israel met at Mr. Worcester's office to sign the Real Estate Purchase Agreement ("REPA") and related legal documents.  See First Amended Complaint ¶ 21, at 4.  Although the date was chosen to ensure the presence of Jarret Glasscock, see id. ¶ 22, at 4, it is not clear from the allegations whether he was at the office.  During the meeting, the parties discussed changes to the REPA.  See First Amended Complaint ¶ 23, at 4. The parties were aware that Keith Glasscock had a medical appointment that afternoon, and the meeting ended before the REPA was signed to allow Keith Glasscock to make his appointment.  See First Amended Complaint ¶¶ 24-25, at 4.

The next day, Keith Glasscock was admitted to the VA Hospital.  See id. ¶ 26, at 4.  Later, in June 2008,[2] while Keith Glasscock was still in the hospital, Jarret Glasscock asked Israel to deed him the unimproved portion of the Alameda property.  After Keith Glasscock agreed with Jarret Glasscock's proposal, Israel also agreed.  See id. ¶ 27, at 5.  Israel drafted an Addendum to memorialize this agreement.  See First Amended Complaint ¶ 28, at 5; Addendum to the Real Estate

---

[2] The First Amended Complaint states June 2008, but this date seems wrong, given that Keith Glasscock died in March 2008.

Agreement (dated September 21, 2007)(Doc. 9-2)("Addendum").  On Jarret Glasscock's instruction, Israel took both the REPA and Addendum to the hospital, where Keith Glasscock signed them.  <u>See</u> First Amended Complaint ¶ 30, at 5.  Jarret Glasscock also signed the Addendum.  <u>See</u> First Amended Complaint ¶ 31, at 5.

At the time that Keith Glasscock signed the REPA, Israel was living in the house with Keith Glasscock's full knowledge and consent.  <u>See</u> Israel Aff. ¶ 3, at 1.  When they finalized the REPA in Mr. Worcester's Santa Fe office, Keith Glasscock and his grandson, Jarret Glasscock, both knew that Israel was living in the house while the purchase was completed.  <u>See id.</u> ¶ 4, at 1-2.  Israel still resides in the house, which she continues to maintain and improve.  <u>See id.</u> ¶ 5, at 2.  Keith Glasscock told third parties that he was proud of how well Israel maintained the property.  <u>See id.</u>

Under the REPA, Israel was to buy the Alameda property from Keith Glasscock for $327,000.00.  <u>See</u> Exhibit 1 to Notice of Filing of State Court Record, Real Estate Purchase Agreement ¶ 2, at 1 (dated September 21, 2007)(Doc. 9-2)("REPA").  Paragraphs 4, 5.1, 5.2, and 5.3 of the REPA addresses Israel's waivers of the seller's disclosure, inspection, title, and survey:

> 4. **Seller's Disclosures.**  In view of the fact that Buyer has been residing on the Property for a number of years, Buyer waives any requirement that Seller furnish a Seller's Disclosure.
>
> * * * *
>
> 5.1 **Inspection.**  In view of Buyer's long-term occupancy of the Property, Buyer waives any inspection contingencies and agrees to accept the Property as is.
>
> 5.2 **Title.**  In view of Buyer's long-term occupancy of the Property, buyer waives any requirement that Seller furnish either a Title Commitment or a Title Insurance Policy.
>
> 5.3 **Survey.**  In view of Buyer's long-term occupancy of the Property, Buyer waives any requirement that Seller provide to Buyer a Survey of the Property.

REPA ¶¶ 4, 5.1-5.3, at 1-2.  Paragraph 12 of the REPA states: "**Possession.**  Buyer shall be entitled

to possession upon Closing and disbursal of the Purchase Price by the Title Company."  REPA ¶ 12, at 3.  Paragraph 18 is an integration clause that states: "This document contains the entire agreement of the parties and supersedes all prior discussions, negotiations and understandings between the parties with respect to Property which are not expressly set forth herein and shall survive and not merge into any conveyance herein contemplated."  REPA ¶ 18, at 4.  Paragraph 18 also states: "This Agreement may only be modified by the mutual consent of the parties in a written document signed and dated by both parties."  Id.  The REPA bears the signatures of Keith Glasscock and Israel, as well as Jarret Glasscock, as successor trustee and attorney-in-fact for Keith Glasscock.  See id. at 4.

The Addendum makes several modifications to the REPA.  According to the Addendum, Jarret Glasscock will divide the property for the family-land transfer, retaining the vacant lots in satisfaction of a the mortgage balance of $327,000.00.  See Addendum to Real Estate Agreement ¶ 2 (dated September 21, 2007)(Doc. 9-2)("Addendum").  Jarret Glasscock would sell the improved lot and residences to Israel for $1.00, with Israel having no further claim or interest in the vacant lots.  See id. ¶¶ 3-4.  Jarret Glasscock's, Keith Glasscock's, and Israel's signatures all appear on the Addendum.

In March 2008, Keith Glasscock traveled to Hobbs, New Mexico, where he died.  See First Amended Complaint ¶ 32, at 5.  The same month, Israel was served with a notice to quit the Alameda property, which Israel believes was served at Jarret Glasscock's instigation.  See id. ¶ 33, at 5.  Israel states that she has been ready and willing to proceed with the REPA, but that Jarret Glasscock, individually and as personal representative of Keith Glasscock's estate, has failed to fulfill the REPA's terms.  See First Amended Complaint ¶¶ 34-35, at 5.

## PROCEDURAL BACKGROUND

Israel initially filed her suit in New Mexico state court.  Israel sought and received a temporary restraining order from the state court on March 17, 2008, which allowed her to remain on the Alameda property.  See Temporary Restraining Order ¶ 1, at 2 (dated March 17, 2008)(Doc. 9-2).  The restraining order expired on March 27, 2008.  Jarret Glasscock removed the case to federal court the following day.  See Notice of Removal Pursuant to 28 U.S.C. §§ 1441 and 1446 ¶¶ 1-2, at 1-2, filed March 28, 2008 (Doc. 1).

Jarret Glasscock now moves the Court, in his individual capacity, for "preliminary relief from the Court to allow him to peaceably regain possession of his real property."  Motion at 1.  Although not explicit in his introduction to his motion, Jarret Glasscock also seeks judgment on the pleadings regarding Count 3.  Jarret Glasscock argues that the REPA does not confer any right to remain on the Alameda property because the REPA states that Israel "'shall be entitled to possession upon Closing,'" which has not occurred.  Motion at 3 (quoting REPA § 12, at 3).  Any reliance Israel might place on § 5 of the REPA, he contends, would be misplaced, because that section contains only waivers in light of Israel's occupancy, but "does not confer upon her a 'right' to *continue* occupying the property for free while collecting income from her rental of the guesthouse."  Motion at 4 (emphasis in original).  Jarret Glasscock also maintains that the Addendum, which purports to lower the purchase price, does not confer any rights of possession upon Israel.  See Motion at 4.

Jarret Glasscock next turns to the MOU, arguing that this document also does not give Israel any right to remain on the Alameda property.  Jarret Glasscock first asserts that the MOU is no longer in effect.  Under the MOU, Israel was to buy Keith Glasscock's Ocamora Ranch in return for Keith Glasscock's purchase of the Alameda property.  Jarret Glasscock maintains, however, that Israel never bought the Ocamora Ranch and instead consented to its sale to a third party.  See

Motion at 4-5.  More importantly, Jarret Glasscock maintains, Israel and Keith Glasscock decided to abandon the MOU.  See Motion at 5.  Second, Jarret Glasscock argues that the terms of the MOU limited Israel's right to remain on the Alameda property.  The MOU, he contends, allowed Israel to stay only until Keith Glasscock died or chose to relocate.  Jarret Glasscock maintains that either of these conditions would remove Israel's right to remain.  Both provisions have been triggered, Jarret Glasscock states, because Keith Glasscock first sold his ranch and moved, and then later died. See Motion at 5-6.

Jarret Glasscock concludes that none of the relevant documents -- the REPA, the Addendum, or the MOU -- grant Israel a right to reside at the Alameda property.  He also notes that Israel has allowed her restraining order to lapse, without moving for a preliminary injunction.  See Motion at 6. For these reasons, Jarret Glasscock contends that  he is entitled to judgment on the pleadings with respect to Count 3 "and/or to preliminary relief to permit [him] to" regain the Alameda property. Id.

Israel begins her Response with a different version of the facts than Jarret Glasscock's.  In particular, Israel states that, after Keith Glasscock sold the Ocamora Ranch, the two of them agreed that Israel would buy back the Alameda property.  With this end in mind, Israel asserts, they entered into the REPA, with the understanding that Israel would reside on the Alameda property until the buy-back was completed.  See Response to Motion for Judgment on the Pleadings and/or Preliminary Relief at 2, filed September 5, 2008 (Doc. 42)("Response").  Israel submits her affidavit attached to the Response in support of these assertions.

Israel then argues that the Court should deny Jarret Glasscock's request for temporary relief. Israel contends that Jarret Glasscock has failed to cite the elements for a preliminary injunction and has "made no attempt to demonstrate how he will satisfy those elements."  Response at 3.  Israel

contends that Jarret Glasscock has not shown that he is likely to succeed on the merits because the REPA is silent whether Israel will stay at the Alameda property, the MOU affirmatively grants her that right, and her affidavit establishes that the intent of the REPA was to allow her to stay.  See Response at 3-4.  Israel also contends that Jarret Glasscock has not shown irreparable injury or that the balance of harms favors him because the "sole issues are financial," for which a remedy at law is adequate.  Id. at 4.  Finally, Israel maintains that Jarret Glasscock "has not . . . articulated any reason why the public interest would favor removing [her] from the house she has resided in since 1999, particularly without following the requisite statutory scheme for such removal."  Id. at 5.

The "requisition statutory scheme" leads to Israel's next line of attack.  She argues that there are two potential proper course of action that Jarret Glasscock should be taking under New Mexico law and that he is doing neither.  Israel maintains that she occupies the Alameda property under a sales contract, bringing the situation within an exception to the Uniform Owner-Resident Act, N.M.S.A. 1978, §§ 47-8-1 to 47-8-28.  Response at 5.  Because the Act does not apply, Israel contends, Jarret Glasscock should file an action for ejectment.  Even if the Act applied, Israel asserts, Jarret Glasscock should affirmatively seek relief from the Court.  This request would be futile, she maintains, because she has not breached her agreement with Keith Glasscock.

Israel's last argument is that the expiration of the restraining order does not mean that she has to vacate the Alameda property.  Israel contends that she has a right to remain and that it is Jarret Glasscock's duty to seek relief if he wants to remove her.  See Response at 6.  Israel notes that Jarret Glasscock has not filed a counterclaim seeking affirmative relief.  See id.

In reply, Jarret Glasscock contends that Israel "does not dispute that the . . . [REPA] gives her no right to remain on the Property."  Reply in Support of Motion for Judgment on the Pleadings and/or Preliminary Relief, filed September 19, 2008 (Doc. 48)("Reply").  He also maintains that

Israel "does not dispute the Addendum's failure to amend ¶ 12's express denial" of her right to remain or "her abandonment of the MOU." Reply at 1. Israel also argues that the REPA's integration clause and the parol-evidence rule bar Israel from using the MOU. See Reply at 2.

Jarret Glasscock then argues that the Court should exclude Israel's affidavit. He maintains that Israel bases Count 3 solely on the REPA and the MOU, and that the Court should not allow her to bring in matters outside the pleadings. See Reply at 2. Moreover, he contends that the affidavit is based on inadmissible hearsay, because it contains statements that Keith Glasscock allegedly made, and she is offering the statements to prove the truth of those statements. See id. at 3. Additionally, Jarret Glasscock asserts that Israel's affidavit seeks, for the first time, to raise a theory that the REPA was orally modified to allow her to remain on the Alameda property. Any oral modifications, he contends, would be ineffective, because of the REPA's clause requiring written modifications, and because of the Statute of Frauds. See Reply at 3-4.

Finally, Jarret Glasscock argues that Israel is taking "the untenable position that she can continue to remain simply because [he] has not affirmatively sought her removal." Id. at 4. He contends that Israel raises the issue by seeking relief in her pleadings that she has a right to remain. See id at 4-5. He further maintains that there is no legal authority for Israel's "proposition that [he] is barred from seeking judgment on the pleadings when he may also have state law remedies to remove her from the Property." Id. at 5. Ultimately, he argues, Israel lacks any right to remain, her restraining order has expired and with it any right to remain, she has "abandoned any claim to continue to remain . . . when she failed to move for a preliminary injunction," and the Court can determine, based on the pleadings, whether Israel has a right to remain. Id.

At the hearing, Michael J. Moffett, Jarret Glasscock's counsel, agreed that under Mark V, Inc. v. Mellekas, 114 N.M. 778, 845 P.2d 1232 (1993), the Court could consider extrinsic evidence

to determine whether an ambiguity existed, but maintained that using such evidence to vary or contradict the terms of the REPA would be contrary to the Statute of Frauds.  <u>See</u> Transcript of Hearing at 6:14-22 (taken October 28, 2008)(Moffett)("Tr.").[3]  The Court also raised its concerns about granting Jarret Glasscock relief without a counterclaim.  Mr. Moffett indicated that the Court's determination would be enough, as he believed Israel would leave peacefully.  <u>See id.</u> at 23:18-24:6 (Court & Moffett).  Mr. Moffett requested that, if the Court did not determine that Israel did not have a right to remain until the end of the case, the Court require Israel to pay rent or insurance, to post a bond, to allow Jarret Glasscock reasonable access to the Alameda property, and to turn over the rent she was collecting on the guesthouse.  <u>See id.</u> at 24:6-15 (Moffett).

The Court then questioned what Israel's position on the validity of the MOU was.  Thomas A. Simons, IV, Israel's attorney, stated that one purpose of the MOU was invalidated, but others remained.  <u>See</u> Tr. at 30:23-31:19 (Court & Simons).  Mr. Moffett said that, in a request for admissions, Israel had stated that the MOU was terminated.  The Court noted it would use the admission for the preliminary injunction portion of the motion.  <u>See</u> Tr. at 43:22-44:13 (Moffett & Court).  Mr. Simons also stated that Israel was not staying on the Alameda property rent free, because Israel was performing up-keep and improvements on the land.  <u>See id.</u> at 33:10-15 (Simons).  Mr. Simons also responded to the Reply's invocation of the Statute of Frauds,  noting that, although he had not specifically looked into the issue, he saw the MOU as a writing satisfying the Statute, that the exceptions for part performance and possession applied, and that the Statute of Frauds might not cover an agreement like the MOU.  <u>See</u> Tr. at 45:8-46:2 (Court & Simons).

---

[3] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain different page and/or line numbers.

## LAW REGARDING INJUNCTIVE RELIEF

Injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Leviton Mfg. Co., Inc. v. Nicor, Inc., No. CIV 04-0424 JB/RHS, CIV 04-1295 JB/ACT, 2007 WL 505796 (D.N.M.)(Browning, J.)(citing Greater Yellowstone Coalition v. Flowers, 321 F .3d 1250, 1256 (10th Cir. 2003)).  The Supreme Court and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to preliminary relief, a moving party must demonstrate: "(1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest."  Wyandette Nat'l v. Sebelius, 443 F.3d at 1254-55 (quoting Kiowa Indian Tribe of Okla. v. Hoover, 150 F.3d 1163,1171 (10th Cir. 1998)). If the moving party demonstrates that the first, third, and fourth factors "tip strongly in his favor, the test is modified," and the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue for litigation and deserving of more deliberate investigation."  Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc., 455 F.3d 1107, 1113 (10th Cir. 2006)(quotation marks omitted).

There are, however,

> three types of specifically disfavored preliminary injunctions [for which] a movant must "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issued": (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.

O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc)("O Centro Espirita"), aff'd 546 U.S. 418 (2006).  Courts in the Tenth Circuit "must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." Id. "[M]ovants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ." Id. at 976.

### NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 817 P.2d 238 (1991), the Supreme Court of New Mexico abolished the four-corners standard of contract interpretation, which required a court to determine whether a contract was ambiguous without considering evidence of the circumstances surrounding the contract's negotiation.  The Supreme Court of New Mexico held that, "in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." Id. at 508-09, 817 P.2d at 242-43 (footnote omitted).  The Supreme Court of New Mexico went on to discuss the parol-evidence rule:

-14-

> The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing. . . . The rule should not bar introduction of evidence to explain terms. As Professor Corbin observes, "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation the meaning of the writing is determined." [A.] Corbin, The Parol Evidence Rule, 53 Yale L.J. 603, 622 (1944). The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation.

C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 509, 817 P.2d at 243 (footnote omitted).

In Mark V, Inc. v. Mellekas, the Supreme Court of New Mexico made it clear that consideration of extrinsic evidence was not only allowed, but required.  See id. at 781, 845 P.2d at 1235 (holding that court committed error when it "relied solely on the face or the 'four corners' of the document").  The Supreme Court of New Mexico summarized the law of contract interpretation in New Mexico as follows:

> The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear.  C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43.  If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law.  Id. at 510, 817 P.2d at 244.  If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists.  Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980).  At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder . . . .

Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.

## ANALYSIS

The central issue is whether the relevant legal documents -- the REPA, the Addendum, and the MOU -- do not give Israel a right to remain on the Alameda property.  Because Israel submitted an affidavit with her Response, the Court must first confront the threshold issue whether to exclude that affidavit.  Because Jarret Glasscock is making a twofold request, for both judgment on the

pleadings and preliminary relief, the Court will consider the affidavit for the preliminary relief request, but not for the request for judgment on the pleadings. Read in light of the surrounding circumstances as revealed in the pleadings, the REPA is an ambiguous contract, and the Court cannot say at this point that Israel does not have a right to continue living on the Alameda property. The limited additional evidence before the Court for purposes of the request for preliminary relief does not change this result, meaning that Jarret Glasscock has not shown a substantial likelihood of success on the merits. Additionally, there are other reasons for denying preliminary relief, such as a failure to demonstrate irreparable harm or to affirmatively seek relief through a counterclaim.

I.      **THE COURT WILL NOT EXCLUDE ISRAEL'S AFFIDAVIT.**

Jarret Glasscock contends that the Court should exclude Israel's affidavit for injecting matters outside the pleadings, for presenting inadmissible hearsay, and for attempting to change the REPA in contradiction of the parol-evidence rule, the REPA's complete integration clause, and the Statute of Frauds. The Court will not consider Israel's affidavit when ruling on the motion for judgment on the pleadings. The Court can, however, properly consider the affidavit when deciding Jarret Glasscock's request for preliminary relief.

The Court may exclude material that is outside the pleadings to prevent a motion to dismiss or for judgment on the pleadings from being converted into a motion for summary judgment. See Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007)(noting that court should convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court"); Fed R. Civ. P. 12(d). Jarret Glasscock has not sought to have his motion turned into a motion for summary judgment and has not resorted to materials outside the pleadings in his Reply. At this early stage of proceedings, the Court believes that it is appropriate to allow Jarret Glasscock's motion to be decided on the terms on which he

presents it: as a motion on the pleadings.  Accordingly, the Court will not consider Israel's affidavit when deciding whether to grant judgment on the pleadings.

Jarret Glasscock's request for preliminary relief presents a different situation.  Although Jarret Glasscock correctly notes that the Court cannot consider inadmissible hearsay in a motion for summary judgment, see Reply at 3 (citing United States v. Fennell, 381 F.Supp.2d 1312, 1314 (D.N.M. 2005)), the Court can consider evidence outside the pleadings, including hearsay, when deciding whether to grant a preliminary injunction, see Pharmanex, Inc. v. HPF, 221 F.3d 1352 at *3 (10th Cir. 2000)(unpublished opinion)(citing J. MOORE, MOORE'S FEDERAL PRACTICE § 65.23 (1999)).  Israel's affidavit largely recites her assertions regarding agreements with Keith Glasscock, now deceased, and is hearsay.  See Fed R. Evid. 802.  In the preliminary injunction context, however, the hearsay in Israel's affidavit is an issue regarding the weight rather than the admissibility of the affidavit.

The parol-evidence rule also does not require exclusion of the affidavit.  "New Mexico law . . . allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.  The parol-evidence rule thus does not impose a categorical ban on resort to materials outside a contract.  One prong of the preliminary-injunction analysis requires the Court to consider whether Jarret Glasscock has made a sufficiently strong showing of likely success on the merits.  This inquiry will involve the construction of the REPA, which in turn, under New Mexico law, will involve the consideration of "the context in which the agreement was made to determine whether the [parties'] words are ambiguous." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.  The Court can therefore consider Israel's affidavit for the threshold issue of ambiguity, and if the Court finds ambiguity, for the purpose of construing the contract at the preliminary-injunction stage.  See id. at 781-82, 845

P.2d at 1235-36 (holding that meaning assigned to ambiguous terms is a question of fact for which extrinsic evidence may be considered).

The REPA's integration clause does not change this result.  The REPA's integration clause states:

> This document contains the entire agreement of the parties and supersedes all prior discussions, negotiations and understandings between the parties with respect to Property which are not expressly set forth herein and shall survive and not merge into any conveyance herein contemplated.  This Agreement may only be modified by the mutual consent of the parties in a written document signed and dated by both parties.

See REPA ¶ 18, at 4.  An integration clause and the parol-evidence rule generally operate in tandem. The integration clause makes it clear that the parties intend the rule to apply.  The parol-evidence rule, however, "should not bar introduction of evidence to explain terms."  C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 509, 817 P.2d at 243.  The Supreme Court of New Mexico has noted that an integration clause does not prevent the use of extrinsic evidence "to show the circumstances under which the parties contracted."  Sanders v. FedEx Ground Package System, Inc., 144 N.M. 449, 188 P.3d 1200, 1208 n.2 (2008).  In other words, an integration clause does not abrogate the approach to contract interpretation in New Mexico under Mark V, Inc. v. Mellekas. The Court will thus not allow Israel's affidavit to contradict or vary the terms of the REPA, but may consider the affidavit for the question of ambiguity.

Finally, the Statute of Frauds does not require exclusion of Israel's affidavit.  The Statute of Frauds requires that agreements for the transfer of land be in writing.  The REPA is a writing that would satisfy the Statute of Frauds.  The Court is not aware of any New Mexico law holding that the Statute of Frauds creates a broader rule against the admissibility of parol evidence in interpreting real estate contracts than would exist for other written contracts with integration clauses.  The

Statute of Frauds traditionally requires that real-estate agreements be in writing and contain all the major terms of the agreement, but this purpose would not conflict with using extrinsic evidence to determine whether terms in an existing written contract were ambiguous or how such terms should be construed.  While New Mexico courts have not specifically addressed the interplay of the Statute of Frauds and the Mark V, Inc. v. Mellekas approach to contract interpretation, the rule has been applied to real estate agreements.  See Hoggard v. City of Carlsbad Through Forrest ¶ 10-11, 121 N.M. 166, 169-170, 909 P.2d 726, 729-30 (Ct.App. 1995)(applying Mark V, Inc. v. Mellekas to three-year lease).

**II.    THE COURT CANNOT PROPERLY GRANT JUDGMENT TO JARRET GLASSCOCK ON THE BASIS OF THE PLEADINGS.**

Even without looking to material outside the pleadings, there are material disputed issues that preclude the Court from granting judgment on Count 3.  Jarret Glasscock contends that none of the three documents on which Israel might rely -- the REPA, the Addendum, or the MOU -- grant Israel a right to remain.  The terms of the REPA and the Addendum, in conjunction with the surrounding circumstances as alleged in the Complaint, however, do not firmly indicate that Israel is without any rights to remain on the Alameda property.  Additionally, based on the pleadings, the MOU provides support for Israel being able to stay.

**A.    THE REPA AND THE ADDENDUM DO NOT UNAMBIGUOUSLY DENY ISRAEL A RIGHT TO REMAIN ON THE ALAMEDA PROPERTY.**

Under Mark V, Inc. v. Mellekas, a court may consider extrinsic evidence if a contract is ambiguous.  Moreover, a court must consider extrinsic evidence at the outset to determine if an ambiguity exists.  See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.  "If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists."  Id.  Once the court determines an ambiguity exists, "if the proffered evidence

of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder." Id. There is a tension between §§ 4 and 5, and § 12 of the REPA, that in light of the surrounding circumstances renders the REPA ambiguous.

Section 4 waives Keith Glasscock's disclosure requirements "[i]n view of the fact that [Israel] has been residing on the Property for a number of years, . . ." REPA § 4, at 1. Section 5 lists waivers that Israel makes of inspection, title insurance, and surveying "[i]n view of [Israel's] long-term occupancy of the Property, . . ." Id. § 5, at 2. Section 12 states that Israel "shall be entitled to possession upon Closing and disbursal of the Purchase Price by the Title Company." Id. § 12, at 3. Sections 4 and 5 imply that Israel lived on, and would remain living on, the Property pending closing, particularly considering § 4's use of the past perfect continuous. See id. § 4, at 1 ("has been residing on the Property for a number of years"). Conversely, § 12 implies that Israel would not live on the Property until after the Closing occurred. The tension between these two contrasting implications in the REPA means that the REPA is "reasonably and fairly susceptible of different constructions." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.

This tension is apparent on the face of the contract. The contract may not truly be ambiguous on those terms alone, but the Court must also consider the attendant circumstances. Given the framing of the motion as judgment on the pleadings, the First Amended Complaint largely provides the context. In light of this context, the Court cannot, on the pleadings alone, construe the REPA as forbidding Israel any right to remain on the Alameda property. This result is not a matter of varying or contradicting the terms in the REPA, but of giving content to the ambiguities in the REPA.

As Israel's pleadings indicate, her living on the Alameda property was part of the

circumstances when the REPA was negotiated.  The earlier MOU, regardless whether it remains in force, provides further context.  The MOU displays a clear intent to allow Israel to remain on the Alameda property.  All the buildup to the REPA that is alleged in the pleadings primarily points to an assumption that Israel would be staying where she was pending completion of the deal. Combined with the tension inherent in the REPA, this background makes the contract ambiguous. The Court cannot, on the pleadings, properly resolve that ambiguity in favor of Jarret Glasscock. The Court also notes that it cannot properly resolve the pleadings in favor of Israel at this stage.

In his Reply, Jarret Glasscock contends that Israel does not dispute that the REPA and the Addendum give "her no right to remain on the Property."  Reply at 1.  Israel's briefing does not support this contention.  Jarret Glasscock does not explain why he considers Israel to have conceded these points.  Presumably, it is based on Israel's failure to specifically respond to every argument he raises.  Israel's discussion of the facts, however, indicates that she believes, based on the surrounding circumstances, that the REPA was drafted with Israel's occupancy in mind.  See Response at 2.  Moreover, she argues that, "[a]t best, the REPA is silent about [her] continued residence in the house."  Response at 3.  It is difficult to see how these amount to a concession that the REPA and Addendum do not give Israel a right to remain at the Alameda property.

Jarret Glasscock is correct that the Addendum does not give Israel a right to remain.  The Addendum, as he notes, does not address such an issue even indirectly.  If Jarret Glasscock were right, and the REPA clearly forbid Israel from being on the Alameda property until the closing, then the Addendum would not save Israel's position.  The converse is also true.  Because the REPA is ambiguous, the Addendum also does not foreclose Israel's argument.  Ultimately, the Addendum is irrelevant for the purposes of resolving Jarret Glasscock's motion for judgment on the pleadings.

**B.   THE EXPIRATION OF THE TEMPORARY RESTRAINING ORDER DOES NOT ENTITLE JARRET GLASSCOCK TO RELIEF.**

Although Jarret Glasscock does not set out this point as a separate argument, he mentions that the expiration of Israel's temporary restraining order supports his contentions.  Expiration of the restraining order, however, does not -- standing alone -- affect the underlying legal situation. If Israel has a right to remain on the property, she will possess that legal right regardless of the expiration of her restraining order.  Temporary restraining orders and preliminary injunctions are judicial mechanisms for preserving the status quo in a dispute.  They are not themselves determinative of legal rights.  Certainly, while the order was in effect, Jarret Glasscock was prevented from seeking Israel's eviction under threat of contempt.  The expiration of that order does not somehow revoke any rights she may have otherwise had.  On a related note, Jarret Glasscock also seems to argue that Israel might have abandoned Count 3 of her Complaint by failing to file for a preliminary injunction.  But Count 3 also contains a request for permanent injunctive relief and Israel has offered a valid explanation for not seeking an injunction -- one is not needed at the moment because Jarret Glasscock is not seeking to summarily evict her now, but is opposing her position through this lawsuit.

**C.   THE MOU DOES NOT DENY ISRAEL THE RIGHT TO REMAIN ON THE ALAMEDA PROPERTY.**

The ambiguity of the REPA, read in the light of the alleged circumstances surrounding its drafting and signing, precludes granting judgment on the pleadings.  Accordingly, although Jarret Glasscock argues that the MOU has been abandoned and is a nullity, it still provides context to the REPA.  The MOU, regardless whether it still has any independent legal force, is part of the background against which the REPA must be viewed.

Additionally, Jarret Glasscock's arguments that the MOU, by its own terms, denies Israel

-22-

a right to remain at the Alameda property is unconvincing.  The MOU, like the REPA, contains some ambiguity on this point.  Jarret Glasscock focuses on the MOU provision granting Keith Glasscock a life estate in the Ocamora Ranch.  As Jarret Glasscock notes, Keith Glasscock's life estate lasts "until his death or until such time as he chooses to relocate."  MOU at 1.  The MOU then states: "Israel may remain in her home until that time, unless other mutual agreements are reached." Id.  Given that Keith Glasscock sold the Ocamora Ranch and moved, and also that he has since died, Keith Glasscock's life estate was terminated, and as a result, Jarret Glasscock argues, Israel's right to "remain in her home until that time" has also been terminated.  Jarret Glasscock's construction of the provision is reasonable, but conflicts with the next provision of the MOU, which states: "Israel is  to remain living in the main house on said property [the Alameda property] as caretaker and manager, without charge, until such time said property is sold."  MOU at 2.  Jarret Glasscock contends that the earlier provision limits the later provision.  It is not clear, however, why Jarret Glasscock's interpretation would be the controlling one, particularly as the later provision seems more concerned with the Alameda property and Israel's rights, while the earlier provision is concerned primarily with Keith Glasscock's life estate.  Instead, the two provisions are in tension and, like the REPA, the MOU is not immediately susceptible of an unambiguous reading.

**III.   THE COURT WILL DENY PRELIMINARY RELIEF.**

Before a preliminary injunction will issue, four elements must be shown: "(1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest."  Wyandette Nat'l v. Sebelius, 443 F.3d at 1254-55 (internal quotation marks omitted).  Because the Court concludes that Jarret Glasscock is seeking a disfavored

injunction that would alter the status quo, he must make a strong showing on all four elements. It is difficult to evaluate Jarret Glasscock's prospects on many of the elements of a preliminary injunction because he has not sought to couch his request within those four elements. The burden rests on Jarret Glasscock, however, so to the extent that the Court cannot adequately gauge the situation with respect to any of the prongs, Jarret Glasscock has failed to carry his burden.

### A.    JARRET GLASSCOCK HAS NOT PROPERLY SOUGHT INJUNCTIVE RELIEF.

Jarret Glasscock has not filed a counterclaim against Israel. Without Jarret Glasscock affirmatively invoking the Court's power in his pleadings, the Court is concerned whether it can or should grant injunctive relief. Because the Court concludes that the elements of an injunction are not met here, the Court need not decide whether a counterclaim would be required. At the hearing, Mr. Moffett stated that he did not believe that the lack of a counterclaim was a problem, because the Court's order would likely be enough. To the extent that Mr. Moffett is stating that he is seeking only judgment in Jarret Glasscock's favor, his prediction of the likely result seems reasonable. To the extent that Jarret Glasscock seeks any form of redress beyond not being found liable on Israel's claims, however, including Mr. Moffett's request for rent or for reasonable access for Jarret Glasscock onto the Alameda property, Jarret Glasscock is seeking affirmative relief. It seems that he would need to plead a request for such relief and would need to succeed on a preliminary injunction request to acquire such relief pre-judgment. In his briefing, Jarret Glasscock argues that, because Israel affirmatively seeks to remain on the Alameda property, he does not need to affirmatively seek removal to deny Israel the relief she requests in Count 3. See Reply at 4-5. This argument is correct, to the extent that the Court could grant judgment in favor of Jarret Glasscock without any affirmative request from him. To secure affirmative relief, however, such as rent or a

preliminary injunction allowing Jarret Glasscock to regain possession, he would need to affirmatively seek court relief.

**B.      THE RELIEF THAT JARRET GLASSCOCK SEEKS IS DISFAVORED.**

Preliminary injunctions that alter the status quo are disfavored in the Tenth Circuit.  See O Centro Espirita, 389 F.3d at 975.  A preliminary injunction that allows Jarret Glasscock to gain possession of the Alameda property would fall into this suspect area.  Israel currently resides at the Alameda property.  She has been living there for several years, since before the current dispute arose.  Accordingly, the status quo is that Israel is in possession of the Alameda property.  See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001)("[T]he status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.")(internal quotation marks omitted).  Whether Israel has a legal right to remain on the Alameda property is not determinative.  Rather, the Court "looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."  Id.  The reality is that Israel is occupying the Alameda property, and she gained possession lawfully.  An injunction forcing her to leave or permitting Jarret Glasscock to oust her would disturb the status quo, and so is disfavored.  Jarret Glasscock must therefore carry his burden on all four elements of the preliminary injunction test.

**C.      JARRET GLASSCOCK HAS NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.**

The Court's decision to deny Jarret Glasscock's motion for judgment on the pleadings largely disposes of his request for preliminary relief.  Because of the disfavored nature of the injunction he seeks, Jarret Glasscock must show that he has a substantial likelihood of success on the merits.  In light of the ambiguities in the REPA that lead the Court to deny judgment on the

pleadings, the Court cannot, on a sound basis, say that Jarret Glasscock has shown a substantial likelihood of success on the merits.

Israel's affidavit, which the Court may consider for these purposes, strengthens the Court's earlier determination that the REPA is ambiguous. Israel's affidavit indicates that Keith Glasscock intended and agreed that she would remain in the house while she bought the Alameda property back. See Israel Aff. ¶ 2, at 1. The Court may also consider Israel's response to Request for Admission No. 22 at this stage. That response does not damage Israel's position much. Israel need not rely on the MOU, and regardless whether the MOU was terminated, the MOU may be used to provide context. If the MOU was terminated, that would undercut the strength of the MOU as a source of background for the later REPA, but the termination is not sufficient to allow Jarret Glasscock to show a substantial likelihood of success on the merits.

### D.      JARRET GLASSCOCK HAS NOT SHOWN IRREPARABLE INJURY.

Because he is seeking disfavored relief, failure on any of the four required elements will defeat Jarret Glasscock's request for an injunction. In addition to not showing a likelihood of success on the merits, however, Jarret Glasscock has not made a sufficient showing on the other three prongs, particularly irreparable injury. While irreparable injury is one of the areas in this case that is difficult to evaluate, Jarret Glasscock does not seem to be seeking to regain the Alameda property for non-pecuniary reasons. He remains a resident of Missouri and his interest in the outcome seems financial. A purely pecuniary interest can generally be remedied by money and will not involve an irreparable injury absent special circumstances. See Port City Properties v. Union Pacific R. Co., 518 F.3d 1186, 1190 (10th Cir. 2008). While the Court is aware, from the hearings, that Jarret Glasscock has concerns about Israel's ability to pay, the central subject of this dispute, the Alameda property, will remain regardless of Israel's financial situation.

### E.   JARRET GLASSCOCK HAS NOT SHOWN THAT THE BALANCE OF HARMS FAVORS HIM.

Jarret Glasscock's primary harm seems to be pecuniary.  Moreover, given that the parties are fighting over the same piece of property, it appears that Jarret Glasscock's and Israel's financial harms would be similar.  Israel, however, is currently living on the Alameda property and using it as a residence.  The balance of harms may thus tilt somewhat in Israel's favor, and the Court cannot with any degree of confidence say that the balance tips in Jarret Glasscock's favor.

### F.   JARRET GLASSCOCK HAS NOT ESTABLISHED THAT AN INJUNCTION WOULD NOT OFFEND THE PUBLIC INTEREST.

Israel contends that Jarret Glasscock has not articulated a sound reason why the public interest would favor removing Israel from the house.  Israel, however, has the standard backwards. Jarret Glasscock need not demonstrate the public interest favors his position, but only that his request does not run afoul of the public interest.  See Wyandette Nat'l v. Sebelius, 443 F.3d at 1254-55 (noting that injunction must "not be contrary to the public interest")(emphasis added).  Jarret Glasscock has not argued why his relief would not offend public interest, but Israel has argued that Jarret Glasscock's request evades New Mexico's legal requirements for seeking ejectment or eviction.

Israel argues that the Uniform Owner-Resident Relations Act does not apply to this case because of an exception for "occupancy under a contract of sale of a dwelling unit or the property of  which it is part, if the occupant is the purchaser or a person who succeeds to his interest." N.M.S.A. 1978 § 47-8-9 (B).  Accordingly, Israel contends, Jarret Glasscock must file an action for ejectment.  In the alternative, Israel argues that, if the Uniform Owner-Resident Relations Act applies, then Jarret Glasscock would still need to seek affirmative relief and a court order under § 47-8-36, which in most circumstances requires a court order to "attempt to remove or dispossess a

resident . . . ."[4]  Without deciding the issue, it appears that New Mexico law requires some form of affirmative action, either through ejectment proceedings or through the Uniform Owner-Resident Relations Act, to remove the occupant of a residence.  Jarret Glasscock is bringing a request in a legal proceeding to allow him to regain possession of the Alameda property, but he has not brought a counterclaim or specifically articulated that he is seeking ejectment, eviction, or some similar relief.  While the Court cannot say that his request definitely runs counter to the public interest, the Court also cannot say that Jarret Glasscock has carried his burden of showing that his request is not contrary to the public interest.  Accordingly, because he is unable to show that all four elements of the preliminary injunction test are met, the Court will not grant preliminary relief.

**IT IS ORDERED** that the Defendant's Motion for Judgment on the Pleadings and/or Preliminary Relief is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Thomas A. Simons, IV
Faith Kalman Reyes
Simons & Slattery, LLP
Santa Fe, New Mexico

*Attorneys for the Plaintiff*

---

[4] Although Israel briefly argues that Jarret Glasscock has no cause of action under the Uniform Owner-Resident Relations Act, that is a question the Court need not address at this point.

-28-

Michael J. Moffett
Comeau, Maldegen, Templeman & Indall, LLP
Santa Fe, New Mexico

*Attorneys for the Defendant*