## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARY E. ISRAEL,

       Plaintiff,

vs.                                 No. CIV 08-0339 JB/LFG

JARRET I. GLASSCOCK, individually and
as personal representative for the Estate of
Keith C. Glasscock,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment, filed November 21, 2008 (Doc. 72)("Motion"). The Court held a hearing on December 30, 2008. The primary issues are: (i) whether the Addendum to the Real Estate Agreement ("Addendum") requires a family-lot split that would be impossible under the governing law; and (ii) whether the Real Estate Purchase Agreement ("REPA") and the Addendum are invalid because Keith C. Glasscock signed them while in a state of mental weakness. Because the Court finds that the Addendum is ambiguous and could, based upon extrinsic evidence, be construed to impose only legally allowable requirements, the Court will not grant summary judgment on Defendant Jarret I. Glasscock's first grounds for summary judgment. Because the Court concludes that the undue influence test is the appropriate legal standard in New Mexico, and because there are genuine disputes over material facts, the Court will also deny summary judgment on Jarret Glasscock's second grounds for summary judgment.

## FACTUAL BACKGROUND

A piece of real estate in Santa Fe County, New Mexico is at the heart of this dispute (the

"Alameda property").  The land was the subject of a complicated series of deals and negotiations between the now-deceased Keith Glasscock and Plaintiff Mary E. Israel.  Israel is currently living on the Alameda property.  Although the Court's earlier opinion in this case lays out Israel's allegations, which were assumed to be true, those allegations provide a basic background on this case.  See Memorandum Opinion and Order at 2-7, entered January 7, 2008 (Doc. 95).

The parties are in substantial disagreement about many of the facts in this case.  What is clear, however, is that Israel drafted the Addendum, and then took both the Addendum and the REPA to the VA Hospital were Keith Glasscock was hospitalized.  Keith Glasscock signed both agreements.  Later, Jarret Glasscock signed both documents as well.  The relevant facts for purposes of this motion largely concern the discussions Israel asserts she had with Jarret and Keith Glasscock about the contents of the Addendum, and Keith Glasscock's mental state at the time he signed the REPA and the Addendum.  The parties have laid out a significant number of facts in their briefing, many of which are contested, but because the Court concludes that there are material disputes of fact and because this motion ultimately turns primarily on questions of law, the Court will only sketch out some of the more significant facts and the disputes the parties have about them.

Israel drafted the Addendum, with the assistance of Charles Samuelson, a high-school teacher with whom Israel spoke over the telephone.  See Motion ¶¶ 12, 14, at 4; Plaintiff's Response to Defendant's Motion for Summary Judgment ¶¶ 12, 14 at 4, filed December 12, 2008 (Doc. 81)("Response").  According to Israel, she had previously discussed splitting the Alameda property into several lots under Santa Fe County's family-transfer laws, and Jarret Glasscock was the person who suggested drafting the Addendum because the land transfers would occur sooner that way.  See Exhibit 1 to Response, Affidavit of Mary Israel ¶¶ 3-5, at 1-2 (executed December 12, 2008)(Doc. 81-2)("Israel Aff.").  The parties agree that Jarret Glasscock is Keith Glasscock's grandson and does

not have any adult children, although he has a sister, and they also agree that Israel is not related to the Glasscock family.  See Motion ¶¶ 1-2, at 3; Response ¶¶ 1-2, at 2.  Israel states that the purpose of the Addendum was to have Jarret Glasscock conduct the land transfers on Keith Glasscock's behalf, with Jarret Glasscock getting a vacant lot as a gift, and Keith Glasscock retaining the improved lot.  See Israel Aff. ¶¶ 5, 9, at 2, 3.  Keith Glasscock would then sell his lot to Israel.  See id. ¶ 5, at 2.  Jarret Glasscock contests this interpretation and believes that the Addendum does not state what Israel asserts it does, but primarily lowers the purchase price of the Alameda property to $1.00.

After drafting the Addendum, Israel visited Keith Glasscock at the hospital.  Keith Glasscock signed both the REPA and the Addendum in his hospital room, with only Israel present.  See Motion ¶ 18, at 4; Response ¶ 18, at 4.  Israel states that she told Keith Glasscock that she had just finished drafting the Addendum, which would imply to him that she did not show the Addendum to Bob Worcester, the attorney who had been working on the REPA.  See Exhibit 1 to Motion, Deposition of Mary E. Israel at 286:10-20 (taken October 17, 2008)(Doc. 72-2).  Jarret Glasscock emphasizes that Israel never expressly told Keith Glasscock that Mr. Worcester reviewed the Addendum.

The parties disagree on Keith Glasscock's mental state at the time of the signing.  Jarret Glasscock contends that hospital records state that Keith Glasscock was suffering from delusions: he reported to hospital staff that he felt like he was being watched and that he was receiving security after having exposed a drug operation.  See Exhibit 6 to Motion, Progress Note (dated September 21, 2007)(Doc. 72-7).  According to Jarret Glasscock, the hospital also had a sitter watching Keith Glasscock for "unsafe behaviors or poor judgment . . . ."  Exhibit 6 to Motion, Progress Note (dated September 20, 2007)(Doc. 72-7).  Israel contends that the progress notes are not properly

authenticated and that they also do not indicate that Keith Glasscock actually displayed poor judgment, but only that he was being observed for such signs.  <u>See</u> Response ¶¶ 8-9, at 3-4.  Jarret Glasscock also maintains that Keith Glasscock was experiencing memory loss during his hospital stay, asking Jarret Glasscock to look after his wallet, which Jarret Glasscock had to keep showing him because Keith Glasscock would forget that he had already turned over his wallet.  <u>See</u> Exhibit 2 to Motion, Affidavit of Jarret I. Glasscock ¶ 2, at 1 (executed November 21, 2007)(Doc. 72-3). Israel argues that Jarret Glasscock's statements are inadmissible hearsay.

Israel's version of events is different.  Israel contends that Keith Glasscock was mentally alert and physically close to normal when he signed the REPA and the Addendum.  She states that "he was mentally alert as ever, . . . he was joking with the staff, and made his usual ironic, perceptive, and intelligent comments."  Israel Aff. ¶ 13, at 4.  According to a long-time friend of Keith Glasscock's, Gene Trujillo, when Trujillo visited in September 2007, Keith Glasscock was "as mentally sharp as he had ever been," Exhibit 2 to Response, Declaration of Gene Trujillo ¶ 3, at 1 (December 12, 2008)(Doc. 81-3)("Trujillo Decl."), and nothing suggested to Trujillo that Keith Glasscock "had lost any of his mental ability," <u>id.</u> ¶ 4, at 2.  Jarret Glasscock emphasizes that Trujillo's observations did not occur on the day that Keith Glasscock signed the documents.

Jarret Glasscock contends that, after Keith Glasscock left the hospital, he realized that he had signed documents during his stay.  According to Jarret Glasscock, Keith Glasscock did not remember having signed anything, was upset that Israel had gotten him to sign documents in the hospital, and called Israel to confront her.  <u>See</u>, <u>e.g.</u>, Exhibit 10 to Motion, Deposition of Mira F. Glasscock at 44:17-22, 45:10-20 (taken September 25, 2008)(Doc. 72-11); Exhibit 8 to Motion, Deposition of Jarret I. Glasscock at 200:14-20 (taken September 24, 2008)(Doc. 72-9).  Keith Glasscock later, Jarret Glasscock maintains, sent a notarized letter to Israel stating that Keith

Glasscock "was incapacitated on [the day of the signing] and had no knowledge or recollection of what he signed."  Exhibit 12 to Motion, Letter from Keith C. Glasscock and Jarret Glasscock to Mary Israel (dated March 5, 2008)(Doc. 72-13).  Israel contends that Keith Glasscock was aware that he had signed the documents, was not angry, and called at his family's behest.  <u>See</u> Israel Depo. at 309:1-313:11.  She further argues that the letter is inadmissible double hearsay and that Keith Glasscock was not incapacitated when he signed the documents.  <u>See</u> Response ¶ 26, at 6; Israel Aff. ¶ 13, at 4.

<u>**PROCEDURAL BACKGROUND**</u>

Jarret Glasscock moves the Court for summary judgment on two grounds: (i) that the Addendum contains a requirement for a family lot split that is not allowed under the Santa Fe Land Development Code ("Code"); and (ii) that both the REPA and the Addendum are invalid because of Keith Glasscock's mental weakness.  Jarret Glasscock points out a number of changes the Addendum purports to make that he views skeptically, but ultimately raises a legal challenge to only one of them: the requirement that Jarret Glasscock create multiple lots from the Alameda property through a family transfer -- selling one lot to Israel and keeping the rest.  <u>See</u> Motion at 6-7.  Jarret Glasscock first argues that the purpose of a family transfer is the preservation of land transfers within families.  Because Israel is not a member of the Glasscock family, Jarret Glasscock contends that using a family transfer under the Code to provide a home to Israel would circumvent the Code's stated goals.  <u>See</u> Motion at 7.

Jarret Glasscock also argues that the Addendum's requirement that he "'divide the property for the family land transfer'" is impossible to fulfill.  Motion at 7 (quoting Addendum to the Real Estate Agreement ¶ 2 (dated September 21, 2007)(Doc. 9-2)("Addendum")).  Under the Code, he maintains, every lot created through the family-transfer process must be given to an adult child or

grandchild of the creator.  Because he does not have any adult children, Jarret Glasscock contends

that he is incapable of creating lots by family transfer.  <u>See</u> Motion at 7-8.

Jarret Glasscock next argues that the Code prohibits a recipient of a lot under a family

transfer from receiving more than one lot.  He interprets the Addendum, however, to require that he

receive at least two vacant lots.  <u>See</u> Motion at 8.  Jarret Glasscock argues that, even if he were able

to divide the property under the family-transfer system, the Addendum would still require a legally

impossible task of him because he could not get more than one lot from the transfer.

Jarret Glasscock's final argument under the Code is that lots created through a family

transfer must be gifts.  The Addendum he contends, however, requires that he keep the vacant lots

to be created through a family transfer in "'payment for the mortgage balance of $327,000 in full.'"

Motion at 8 (quoting Addendum ¶ 2).  Lots intended as payments are not gifts, he asserts, and

therefore the Addendum sets out a plan that cannot be followed without violating the Code.

Jarret Glasscock then turns to his second grounds for summary judgment: Keith Glasscock's

alleged mental weakness at the time he signed the REPA and the Addendum.  Jarret Glasscock

maintains that Keith Glasscock signed these documents while in the hospital, being watched for

"poor judgment," and experiencing memory loss and paranoid delusions.  Motion at 9-10.  When

Keith Glasscock was released from the hospital, Jarret Glasscock maintains, he could not remember

signing the agreements and was angry about the incident.  <u>See</u> Motion at 10.  Jarret Glasscock

maintains that Keith Glasscock sent a notarized letter to Israel saying he was incapacitated and had

no recollection of signing anything.  <u>See</u> Motion at 11.  According to Jarret Glasscock, after Keith

Glasscock confronted Israel, she drew up several new documents: (i) a promissory note for

$327,000.00; (ii) a mortgage securing the note; and (iii) a warranty deed conveying the Alameda

Property to Israel.  Jarret Glasscock maintains that Israel told Sunset Hills, Missouri police officers

that she needed Keith Glasscock to sign the documents, while Keith Glasscock told the police officers that Israel had him sign documents while under medication.  See Motion at 10.  Jarret Glasscock argues that these incidents demonstrate that Keith Glasscock was in a state of mental weakness, destroying his capacity to contract and requiring the Court to set aside the REPA and the Addendum.

Alternatively, Jarret Glasscock argues that, even if Keith Glasscock's mental weakness alone was not severe enough to void the contracts as a matter of law, his mental weakness was accompanied by other inequitable incidents. Taken together, he contends, these factors require the invalidation of the agreements.  He points to four separate alleged inequitable incidents: (i) Israel exerting undue influence on Keith Glasscock; (ii) the inadequacy of a $1.00 purchase price; (iii) a lack of consideration to Keith Glasscock; and (iv) Israel making misrepresentations to Keith Glasscock about Mr. Worcester's involvement in drafting the Addendum.

Israel was in a position of confidence with Keith Glasscock, Jarret Glasscock maintains, and was aware of Keith Glasscock's mental weakness "as far back as November 2006."  Motion at 12. Jarret Glasscock states that Mr. Worcester observed that Israel was the person driving the negotiations leading to the REPA, but that she drafted the Addendum without consulting Mr. Worcester, instead relying on help from Samuelson.  See Motion at 12. Jarret Glasscock contends that, despite knowing that Keith Glasscock had an attorney, Israel did not allow the attorney to review the Addendum.  Together, Jarret Glasscock maintains, these facts indicate that Israel took advantage of Keith Glasscock's trust in her to exert undue influence over him while he was in a mentally weakened condition.

Jarret Glasscock then maintains that the consideration under the Addendum is inequitable. Jarret Glasscock notes that the Addendum lowers the price from $327,000.00 to $1.00, and

maintains that Mr. Worcester observed during the negotiations that, despite Israel's urging, Keith Glasscock refused to lower the price below $327,000.00. <u>See</u> Motion at 13. Jarret Glasscock also argues that the consideration going to Keith Glasscock is invalid. As Jarret Glasscock reads the Addendum, both the vacant lots that were to be created and the $1.00 were to go to him, even though Keith Glasscock owned the Alameda property, with nothing going to Keith Glasscock.

Finally, Jarret Glasscock argues that Israel misrepresented Mr. Worcester's involvement in the Addendum. Jarret Glasscock contends that Israel never told Keith Glasscock that Mr. Worcester had not seen the Addendum, creating the false impression that Mr. Worcester had seen it. <u>See</u> Motion at 14. Moreover, Jarret Glasscock maintains that Israel misrepresented the Addendum to him as the original agreement between Keith Glasscock and Israel and that she needed his signature only as a witness to Keith Glasscock's signature. <u>See</u> Motion at 14. These misrepresentations, Jarret Glasscock asserts, took advantage of Keith Glasscock's mental weakness, making the REPA and the Addendum invalid.

Israel contests both of Jarret Glasscock's arguments for summary judgment. Israel argues that the family-lot split in the Addendum could be carried out under the Code. Israel maintains that Jarret Glasscock was to split the lot on Keith Glasscock's behalf, giving one parcel to Jarret Glasscock and possibly a second parcel to another family member as a gift, and retaining one lot for himself, which he could then alienate. <u>See</u> Response at 13-14. Israel also argues that Jarret Glasscock's mental weakness arguments are ineffectual because he is required to show an undue influence and confidential relationship by clear-and-convincing evidence. Israel maintains that numerous disputed facts prevent him from making this showing on summary judgment.

For her first point on the family-transfer issue, Israel argues that Jarret Glasscock is misinterpreting the Addendum. She maintains that Jarret Glasscock was to conduct the lot split on

Keith Glasscock's behalf, but that Keith Glasscock remained the owner.  See Response at 14.  The lots emerging from the lot split would be transferred from Keith Glasscock to his grandchildren, not from Jarret Glasscock.  See id.  The plan, Israel asserts, would therefore comply with the Code.

Second, Israel argues that the Addendum does not require three or more lots to be created. Rather, she contends, the Addendum left the number of lots up to Keith Glasscock, acting through Jarret Glasscock.  See Response at 13-14.  Israel further contends that Israel was not going to be a transferee under the Addendum, but rather Keith Glasscock would, after the transfer, convey his lot to Israel, which would be acceptable under the Code.  See Response at 14.

Third, Israel maintains that the transfer of land to Jarret Glasscock would be a gift.  See id. Ultimately, Israel argues, the Addendum's plan complies with the Code.  She notes that the Code does not restrict the alienation of property post-transfer, does not, contrary to Jarret Glasscock's interpretation, require transfers to be gifts, and does not require that a transfer's purpose comply completely with the Code's stated purposes, which she argues only explain why the specific rules governing family transfers were adopted.  See Response at 15-16.

Israel then addressed Jarret Glasscock's mental weakness arguments.  She maintains that these arguments, which rely on a single case, Morgan v. Thompson, 46 N.M. 282, 127 P.2d 1037 (1942), fail.  According to Israel, Morgan v. Thompson does not allow for mental weakness alone to be the basis of invalidation, but holds that the weakness must be accompanied by fraud, duress, or undue influence, of which Israel argues only undue influence is even plausible.  See Response at 16.  Israel further contends that, to the extent that Morgan v. Thompson places the burden on her to show Keith Glasscock's capacity and a lack of undue influence, the case has been superseded and it is Jarret Glasscock who must prove his allegations of undue influence by clear-and-convincing evidence.  See Response at 17.

-9-

Israel then argues that Jarret Glasscock cannot demonstrate undue influence by clear-and-convincing-evidence.  She first discusses the "leading New Mexico undue influence decision," Gersbach v. Warren, 125 N.M. 269, 960 P.2d 811 (1998).  Response at 18.  Israel contends that Gersbach v. Warren requires Israel to show both a confidential relationship and suspicious circumstances, of which the case lists several, which are a non-exhaustive and non-dispositive list of potential factors.  See Response at 19-20.  Israel also contends that showing the required factors only creates a rebuttable presumption of undue influence and that old age is not alone sufficient to demonstrate undue influence.  See id. at 20.

Israel argues that Jarret Glasscock cannot carry his burden.  She maintains that there is insufficient evidence of a confidential relationship and that Jarret Glasscock was more in a relationship of trust than she was.  See Response at 20-21.  Israel also contends that the facts will not support the various potential suspicious circumstances factors.  Israel maintains that, although Keith Glasscock was elderly, he was relatively healthy and did not suffer from a weakened mental condition.  See Response at 21.  She also maintains that there is consideration, stating that Jarret Glasscock would receive a portion of the Alameda property sooner under the Addendum than he would have otherwise.  See Response at 22.  Turning to a Gersbach v. Warren factor Jarret Glasscock did not address, she contends that her receiving the property would not be "unnatural" or "unjust," because she had paid taxes and insurance and made improvements.  Response at 22. Israel argues that Jarret Glasscock, not Israel, wanted the terms of the Addendum, and that Keith Glasscock's refusals to lower the price indicated she did not dominate him.  See Response at 22-23. Finally, she contends that Jarret Glasscock was aware of the Addendum, that he signed both the REPA and the Addendum, and that Mr. Worcester had approved of the concepts behind the Addendum.  See Response at 23.

-10-

In reply, Jarret Glasscock argues that Israel's construction of the family transfer described in the Addendum contradicts the actual wording of the Addendum that Israel drafted. Because Israel is the drafter, Jarret Glasscock argues that it is presumed that she used the language she intended and bears the burden of proving otherwise. See Reply at 2-3. She cannot carry this burden, Jarret Glasscock maintains, because the Addendum makes repeated reference to "Jarret" acting and selling Israel the property, with no indication, either in the text or signature line of the Addendum, that he was to be acting in a representative capacity. Reply at 3. To the extent that Israel is trying to show ambiguity, her attempt must fail, he maintains, because ambiguities are construed against the drafter. See Reply at 4.

Jarret Glasscock next argues that the declaration of Emilio Gonzales, a plats examiner for Santa Fe County, offered in support of Israel's interpretation of the Addendum, should be stricken. Jarret Glasscock contends that the declaration attempts to contradict the Addendum's terms. Moreover, he maintains that it is inadmissible, because it is unreliable expert testimony, seeks to state a legal conclusion, and lacks a reliable foundation. See Reply at 4-6.

Jarret Glasscock then argues that Keith Glasscock's mental weakness alone is sufficient to set aside his contracts, and that undue influence and other factors "only come into play" when the mental weakness does affect the ability to understand agreements. Reply at 6. Jarret Glassock contends that he need not demonstrate Keith Glasscock lacked competency. Moreover, he contends that Keith Glasscock's mental weakness places the burden on Israel to show Keith Glasscock's capacity to contract and that the contracts were perfectly fair. See id. This burden, Jarret Glasscock contends, is one that Israel has not met. Jarret Glasscock maintains that Israel's own evidence indicates that she had concerns about Keith Glasscock's sanity and that medical records indicate he was hallucinating the day he signed the contracts, while the records she cites to show Keith

Glasscock's competence ignore other records from the same time period indicating that Keith Glasscock was hallucinating.  See id. at 6-8.

Jarret Glasscock disputes that Gersbach v. Warren supersedes Morgan v. Thompson, but contends that even under that standard he is entitled to summary judgment.  Jarret Glasscock argues that Israel had a confidential relationship with Keith Glasscock and that suspicious circumstances were present.  Jarret Glasscock contends that Israel's own statements about her relationship with Keith Glasscock, such as her control over bank accounts and limited powers of attorney, indicate a confidential relationship.  See Reply at 10.  Jarret Glasscock maintains that Keith Glasscock's hallucinations, Mr. Worcester's lack of involvement with the Addendum, the sharp drop in purchase price from $327,000.00 to $1.00, Israel's being alone with Keith Glasscock when he signed, and the elimination of any consideration to Keith Glasscock all establish suspicious circumstances.  See Reply at 10-12.  Accordingly, Jarret Glasscock contends, a rebuttable presumption of undue influence, which Israel has not rebutted, would arise.

At the hearing, Faith Reyes, Israel's attorney, argued that Israel was not a sophisticated drafter  like a large corporation, so the rule on construing contracts against the drafter should not apply, while Mark V., Inc. v. Mellekas, 114 N.M. 778, 845 P.2d 1232 (1993), required the Court to take evidence to resolve ambiguities in the Addendum.  See Transcript of Hearing at 89:13-90:3 (taken December 30, 2008)(Reyes)("Tr.").[1]  Reyes argued that the evidence indicating that Keith Glasscock was hallucinating was inadmissible hearsay.  Mr. Moffett argued that his evidence that Keith Glasscock was hallucinating was not inadmissible hearsay because it was a business record and because he was not seeking to prove the truth of the matter, but that Keith Glasscock was

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain different page and/or line numbers.

hallucinating.  See id. at 106:4-16 (Moffett).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the movant demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has "the 'initial burden to show that there is an absence of evidence to support the nonmoving party's case.'"  Mirzai v. State of N.M. Gen. Services. Dep't, 506 F.Supp.2d 767, 774 (D.N.M. 2007)(Browning, J.)(quoting Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)).  In addition to showing that there are no questions of material fact, the moving party must also show that it is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party meets that initial burden, the nonmoving party bears the burden of setting "forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "For the purposes of summary judgment, the court assumes the evidence of the nonmoving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor."  Velasquez v. Frontier Med., Inc., 375 F.Supp.2d at 1263 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986))  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(internal quotation marks omitted).

## SANTA FE COUNTY LAW ON FAMILY LAND TRANSFERS

The Code restricts land use and development in Santa Fe County, but exempts certain family-lot transfers from certain requirements.  The purpose of this Code provision is:

4.3.1a   To maintain local cultural values by perpetuating and protecting a traditional method of land transfer within families, especially within traditional communities; and

4.3.1b   To permit transfers of lots which do not meet the lot size requirements of the Code from grandparents, parents, or legal guardians as a one time gift to a child or grandchild in order to provide a more affordable home site for these adult children.

Exhibit 15 to Motion, Code art. II, § 4.3.1.  The Code defines a "small lot family transfer" as: "A lot created as a gift from grandparent, parent, or legal guardian to his or her natural or adopted child or grandchild or legal ward . . . . Any person may receive only one lot through Small Lot Family Transfer."  Id. § 4.3.2b.  The recipients of a transfer must be "adult or emancipated minor[s]."  Id. § 4.3.3b(ii).

## NEW MEXICO LAW ON CONTRACT INTERPRETATION AND EXTRINSIC EVIDENCE

In C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 817 P.2d 238 (1991), the Supreme Court of New Mexico abolished the four-corners standard of contract interpretation, which required a court to determine whether a contract was ambiguous without considering evidence of the circumstances surrounding the contract's negotiation.  The Supreme Court of New Mexico held that, "in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance."  Id. at 508-09, 817 P.2d at 242-43 (footnote omitted).  The Supreme Court of New Mexico went on to discuss the parol-evidence rule:

The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing. . . . The rule should not bar introduction of evidence to explain terms. As Professor Corbin observes, "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation the meaning of the writing is determined."

[A.] Corbin, <u>The Parol Evidence Rule</u>, 53 Yale L.J. 603, 622 (1944). The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation.

<u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 112 N.M. at 509, 817 P.2d at 243 (footnote omitted).

In <u>Mark V, Inc. v. Mellekas</u>, the Supreme Court of New Mexico made it clear that consideration of extrinsic evidence was not only allowed, but required.  <u>See id.</u> at 781, 845 P.2d at 1235 (holding that court committed error when it "relied solely on the face or the 'four corners' of the document").  The Supreme Court of New Mexico summarized the law of contract interpretation in New Mexico as follows:

> The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear.  <u>C.R. Anthony</u>, 112 N.M. at 508-09, 817 P.2d at 242-43.  If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law.  <u>Id.</u> at 510, 817 P.2d at 244.  If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists.  <u>Vickers v. North Am. Land Dev., Inc.</u>, 94 N.M. 65, 68, 607 P.2d 603, 606 (1980).  At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder . . . .

<u>Mark V, Inc. v. Mellekas</u>, 114 N.M. at 781, 845 P.2d at 1235.

In <u>Rummel v. St. Paul Surplus Lines Ins. Co.</u>, 123 N.M. 767, 945 P.2d 985 (1997), the Supreme Court of New Mexico considered the interplay of extrinsic evidence and the principle that ambiguous contracts should be construed against their drafters.  The plaintiff had attempted to collect on a judgment from the defendant's liability insurers.  The question was whether the insurance contracts relieved the insurers -- the drafters -- from having to pay for punitive damages.  The Supreme Court of New Mexico held:

> Where ambiguities exist as a result of the insurer's unsuccessful attempt to exclude punitive damages, this Court can remand the case to the trier of fact for consideration of the facts and circumstances surrounding the formation of the contract which might

-15-

enlighten the court as to the true intent of the contracting parties. Mark V, 114 N.M. at 781, 845 P.2d at 1235 ("Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact."). In the absence of extrinsic evidence necessitating otherwise, ambiguities will be resolved in favor of the insured.

Rummel v. St. Paul Surplus Lines Ins. Co., 123 N.M. at 770-71, 945 P.2d at 988-89.

## NEW MEXICO LAW ON MENTAL WEAKNESS AND UNDUE INFLUENCE

In Morgan v. Thomas, the plaintiff had sought to cancel a deed he had executed. The Supreme Court of New Mexico upheld the trial court's finding that the plaintiff was mentally weak, but that "he was able to, and did, comprehend the nature and effect of the transaction." Id., 46 N.M. 282, 127 P.2d at 1040. "Standing alone," this mental weakness was "not sufficient to authorize the cancellation of his deed." Id. The Supreme Court of New Mexico quoted from a treatise:

> It is well settled that there may be condition[s] of extreme mental weakness and loss of memory, either congenital, or resulting from old age, sickness, or other cause, and not being either idiocy or lunacy, which will, without any other incidents or accompanying circumstances, of itself destroy the person's testamentary capacity, and a fortiori be ground for defeating or setting aside his agreements and conveyances. It is equally certain that mere weak-mindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance. If, as is frequently if not generally the case, the mental weakness and failure of memory are accompanied by other inequitable incidents, and are taken undue advantage of through their means, equity not only may but will interpose with defensive or affirmative relief. Finally, in a case of real mental weakness, a presumption arises against the validity of the transaction, and the burden of proof rests upon the party claiming the benefit of the conveyance or contract to show its perfect fairness and the capacity of the other party.

Id., 46 N.M. 282, 127 P.2d at 1041 (quoting 2 Pom.Eq.Jurisprudence, § 947). Because the plaintiff could understand the transaction despite his mental weakness and there was no evidence of inequitable incidents, the Supreme Court of New Mexico reversed the trial court's cancellation of the deed. See Morgan v. Thompson, 46 N.M. 282, 127 P.2d at 1041.

In <u>Gersbach v. Warren</u>, the Supreme Court of New Mexico stated:

> Undue influence is not "susceptible of any fixed formula." <u>Hummer v. Betenbough</u>, 75 N.M. 274, 282, 404 P.2d 110, 116 (1965) (quoting <u>Brown v. Cobb</u>, 53 N.M. 169, 172, 204 P.2d 264, 266 (1949)). In fact, "New Mexico courts have refused to state a legal definition of undue influence." Mary Catherine McCulloch, Comment, <u>Undue Influence in Wills-Evidence-Testators' Position Changes After In re Will of Ferrill</u>, 13 N.M.L.Rev. 753, 755-56 (1983) (characterizing the Court's analysis as avoiding "a blue print for the commission of a wrongful act"). We have, instead, "described the approach contestants must use to prove an undue influence claim." <u>Id.</u> at 755. We have held that a confidential relationship is required in order to support a determination of undue influence. <u>Hummer</u>, 75 N.M. at 282, 404 P.2d at 116. In addition to a confidential relationship, however, suspicious circumstances must also exist. <u>Id.</u> at 280, 404 P.2d at 114.

<u>Gersbach v. Warren</u> ¶ 8, 125 N.M. at 272, 960 P.2d at 814. The Supreme Court of New Mexico went on to list some circumstances that could be suspicious:

> (1) old age and weakened physical or mental condition of testator; (2) lack of consideration for the bequest; (3) unnatural or unjust disposition of the property; (4) participation of beneficiary in procuring the gift; (5) domination or control over the donor by a beneficiary; and (6) secrecy, concealment, or failure to disclose the gift by a beneficiary.

<u>Id.</u> "This is not an exhaustive list, nor is it a list of circumstances that are always suspicious. Furthermore, the presence of any of these circumstances is not in itself dispositive." <u>Id.</u> The Supreme Court of New Mexico also defined a confidential relationship: "A confidential or fiduciary relationship exists when one person places trust and confidence in the integrity and fidelity of another." <u>Id.</u> ¶ 11, 125 N.M. at 273, 960 P.2d at 815 (internal quotation marks omitted). The Supreme Court of New Mexico stated that the party challenging a transaction bore the burden of proving undue influence "by clear and convincing evidence." <u>Id.</u> ¶ 9, 125 N.M. at 272, 960 P.2d at 814. Ultimately, the question is whether the gift or transaction would occur "but for the undue influence exerted over" the party. <u>Id.</u> ¶ 8, 125 N.M. at 272, 960 P.2d at 814. Establishing a confidential relationship and suspicious circumstances raises a presumption of undue influence,

shifting the burden to the party supporting a document to rebut the presumption.  See id.  While Gersbach v. Warren dealt specifically with a testamentary gift, it relied heavily on, and reiterated many of the rules of undue influence from, Montoya v. Torres, 113 N.M. 105, 823 P.2d 905 (1991), which involved a challenge to a deed.

## ANALYSIS

Jarret Glasscock presents two grounds for summary judgment to the Court: (i) that the Addendum is invalid because it calls for a family-land transfer that would be impossible under the Code; and (ii) that both the REPA and the Addendum are invalid because of Keith Glasscock's mental weakness at the time he signed the two documents.  The Court concludes that summary judgment in not proper.  There are ambiguities in the Addendum that could potentially, in light of extrinsic evidence, be construed consistent with the Code's requirements.  Jarret Glasscock's mental-weakness defense is properly raised as an undue-influence defense, and there are genuine issues of material fact whether Keith Glasscock was subject to undue influence.

## I.    THE COURT WILL NOT GRANT SUMMARY JUDGMENT TO JARRET GLASSCOCK ON THE BASIS OF THE ADDENDUM CONFLICTING WITH THE CODE.

Jarret Glasscock argues that the Addendum's lot-split scheme conflicts with the Code.  The parties seem to be in agreement that Jarret Glasscock, who has no adult children, cannot himself perform a family-land transfer.  On the other hand, the way that Israel describes the proposed lot split would be permissible under the Code.  The key question then is whether Israel's version of the plan is a permissible reading of the Addendum, or whether, as Jarret Glasscock argues, the language of the Addendum and the rule that a contract must be construed against its drafter preclude Israel's version of the Addendum.  The Court concludes that Israel may rely on extrinsic evidence, even though she is the drafter, and that her offered interpretation does not contradict the Addendum, but

is one possible construction of an ambiguous document.

Given the principles of New Mexico contract interpretation potentially involved, the sensible starting place for this issue is whether Israel's construction of the Addendum would comply with the Code. Jarret Glasscock has focused his attack on whether the Addendum could say what Israel wants it to say and has not challenged that Israel's proffered interpretation would be invalid under the Code. This approach ultimately strikes the Court as sensible, because Israel's understanding of the Addendum, if it prevailed, would be consistent with the Code's requirements. If Jarret Glasscock were acting only as Keith Glasscock's agent, and the owner and actual party whose land was involved in the family transfer was Keith Glasscock, then the deficiencies Jarret Glasscock identifies in the Addendum's plan go away.

If Israel was not to receive land directly under the transfer, then the scheme would not contradict the Code's purpose of protecting methods of land transfers "within families," Code, art. II, § 4.3.1a, or to provide home sites for "adult children," id. § 4.3.1b. There is nothing in the Code restricting alienation after a land transfer is completed. If the land was being transferred from Keith Glasscock to Jarret Glasscock, the transfer would permissibly be one to an adult grandchild. See id. § 4.3.2b. Jarret Glasscock receiving only a single lot under the transfer would also not violate the Code. See id. Finally, if Jarret Glasscock received the lot as a gift rather than in payment for a mortgage balance, the Code would be satisfied. See id.[2]

Under C.R. Anthony v. Loretto Mall Partners and Mark V, Inc. v. Mellekas, the Court must hear extrinsic evidence to determine whether a contract is ambiguous and, if the contract is ambiguous, then the interpretation of the contract involves a question of fact. On the other hand,

---

[2] The Court need not decide whether to exclude Gonzales' affidavit, because the Court can reach the legal conclusions here without considering that affidavit.

New Mexico courts have often stated the general rule that an ambiguous contract is to be construed against its drafter.  <u>See</u>, <u>e.g.</u>, <u>Campos v. Homes By Joe Boyden, L.L.C.</u> ¶ 9, 140 N.M. 122, 125, 140 P.3d 543, 546 (Ct.App. 2006); <u>Heye v. American Golf Corp., Inc.</u> ¶ 15, 134 N.M. 558, 563, 80 P.3d 495, 500 (Ct.App. 2003).  These two rules are on a collision course.  <u>Mark V, Inc. v. Mellekas</u> indicates that ambiguities should generally be left to resolution by the fact-finder, while the canon of construction indicates that the Court should decide an ambiguity against the drafter as a matter of law.  Before the Court worries about which rule must give way, however, it must determine whether both rules would apply here.

While Israel offers her own interpretation of the Addendum, that interpretation must have some evidentiary support and the evidence in the record must not be "so plain that no reasonable person could hold any way but" against Israel's position.  <u>Mark V, Inc. v. Mellekas</u>, 114 N.M. at 781, 845 P.2d at 1235.  Israel has presented sufficient evidence that, if the evidence could be used, would demonstrate ambiguities in the Addendum that would preclude summary judgment.  On its face, the Addendum's language primarily supports Jarret Glasscock's interpretation.  With the attendant circumstances in mind, however, ambiguities appear.  Jarret Glasscock was not the owner of the Alameda property, raising the question why the Addendum states that Jarret Glasscock would conduct the family-land transfer.  The Addendum's statement that "Jarret will divide the property for the family land transfer . . . ," Addendum ¶ 2, becomes at least ambiguous in light of his lack of ownership and Israel's statement that she and Jarret Glasscock agreed that he would divide the property on behalf of Keith Glasscock, <u>see</u> Israel Aff. ¶ 3, at 1.  The Addendum is also ambiguous whether Jarret Glasscock was to receive a vacant lot for consideration.  Israel's affidavit states the lot would be a gift from Keith Glasscock to Jarret Glasscock.  <u>See</u> Israel Aff. ¶ 9, at 3.  Given Jarret Glasscock's lack of ownership in the Alameda property, this evidence does not contradict the

Addendum's statement that he "would retain the resulting vacant lot or lots in full payment for the mortgage . . . ." Addendum ¶ 2. As between Keith Glasscock and Jarret Glasscock, the transfer may be a gift. See Israel Aff. ¶ 9, at 3. Finally, even on its face, the Addendum does not clearly state that Jarret Glasscock had to receive multiple lots or that Israel would receive a lot under the family-land transfer. The Addendum states "lot or lots," which allows for the possibility of a single lot. Addendum ¶ 2. Given the choice between a possible interpretation and a legally impermissible interpretation, the Court does not see why the Addendum should be read to require Jarret Glasscock to receive multiple lots. The Addendum also states that Jarret Glasscock would sell Israel the improved lot, not that Israel would receive the lot as part of the transfer. See id. ¶ 3. Israel's affidavit supports these interpretations. See Israel Affidavit ¶ 3, at 1-2. In sum, Israel has presented evidence that allows the Court to consider the Addendum ambiguous and could permit the Court to construe it in a manner consistent with the Code, which is sufficient to defeat summary judgment if the Court applied Mark V, Inc. v. Mellekas. Jarret Glasscock argues that Israel, as drafter, has the burden of showing that the Addendum means something other than its plain meaning. Whatever the merits of this argument -- although Israel as plaintiff would bear the burden anyway so it may be a moot point -- on summary judgment she need only show that there are disputed issues of material fact on the issue.

Jarret Glasscock argued in his Reply that, because Israel is the drafter of the Addendum, any ambiguity must be construed against her. At the hearing, Israel argued that this rule of construction was relevant to corporations and similar drafters, but that the policy of the rule would not support its extension to a contract an individual drafted. New Mexico courts have frequently acknowledged the canon of construction that construes an ambiguous contract against the drafter, but they have not defined the scope of the rule. Some cases hint that Israel's position might be correct. See Salazar

v. Citadel Communications Corp. ¶ 15, 135 N.M. 447, 452 90 P.3d 466, 471 (2004) (noting "the rule, oft-repeated in this state, that we construe ambiguous adhesion contracts against the drafter"). Other cases have applied the canon to agreements that an individual has drafted.  See Smith v. Tinley, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984)(applying canon against partner who drafted partnership agreement).  The Court is unable to locate any decisions applying New Mexico law, in either state or federal court, that have expressly found that New Mexico law limits the application of the canon of construction to adhesion contracts or to sophisticated or powerful parties.  Moreover, New Mexico courts have referenced the Restatement of Contracts (Second) when invoking the canon.  The Restatement comments: "The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases." Restatement of Contracts (Second) § 206 cmt. a.  Given that New Mexico courts have generally expressed the applicability of the canon in broad terms, without qualifying that the canon is limited to use against certain parties, the Court cannot say that the rule does not apply to a drafter such as Israel.

Accordingly, because both the canon of construction and the rule in Mark V, Inc. v. Mellekas are initially applicable, the Court must determine how the two rules interact.  The New Mexico state courts have not discussed the issue in depth.  What case law exists, however, indicates that the canon of construction should be limited here and that summary judgment would be inappropriate.  The only New Mexico case bearing on the dilemma is Rummel v. St. Paul Surplus Lines Ins. Co.  The plaintiff in Rummel v. St. Paul Surplus Lines Ins. Co. attempted to collect on a judgment from the defendant's liability insurers.  The question was whether the insurance contracts relieved the insurers -- the drafters -- from having to pay for punitive damages.  The Supreme Court of New Mexico applied both the principle that ambiguous contracts should be construed against their drafters and

the rule that the interpretation of an ambiguous contract is generally a question of fact. The Supreme

Court of New Mexico held:

> Where ambiguities exist as a result of the insurer's unsuccessful attempt to exclude
> punitive damages, this Court can remand the case to the trier of fact for consideration
> of the facts and circumstances surrounding the formation of the contract which might
> enlighten the court as to the true intent of the contracting parties. Mark V, 114 N.M.
> at 781, 845 P.2d at 1235 ("Once the agreement is found to be ambiguous, the
> meaning to be assigned the unclear terms is a question of fact."). In the absence of
> extrinsic evidence necessitating otherwise, ambiguities will be resolved in favor of
> the insured.

Rummel v. St. Paul Surplus Lines Ins. Co., 123 N.M. at 770-71, 945 P.2d at 988-89. This holding

indicates that the canon of construction should be applied after the Mark V, Inc. v. Mellekas process

and should not be employed to short-cut that process.

      The only other case of which the Court is aware that confronts this issue supports this

interpretation. A recent appeal to the United States Court of Appeals for the Tenth Circuit

Bankruptcy Appeal Panel, In re Crowder, 2008 WL 4228382 (10th Cir. BAP)(slip

copy)(unpublished opinion), upheld a bankruptcy court's decision to effectively give priority to

Mark V, Inc. v. Mellekas over the canon of construction. The bankruptcy court had heard extrinsic

evidence, but ultimately ruled that the contract at issue was ambiguous and must be construed

against the drafter. The panel affirmed, stating that, "despite the presentation of evidence as to the

circumstances and intent of the parties, the court could not determine the intent of the parties or that

they had reached a meeting of the minds on this issue. In other words, despite the evidence, the

ambiguity persisted." Id. at *4. Because the ambiguity survived the extrinsic evidence, "[t]he

bankruptcy court then properly resorted to a canon of construction." Id.

      Another case from New Mexico provides further support. Manuel Lujan Ins., Inc. v. Jordan,

100 N.M. 573, 673 P.2d 1306 (1983), predates Mark V, Inc. v. Mellekas or C.R. Anthony v. Loretto

-23-

Mall Partners, but did not apply the canon of construction as an ironclad rule that precluded extrinsic evidence from being used when there was a contract that had an identifiable drafter.  The Supreme Court of New Mexico upheld the lower court's use of parol evidence:

> We are not unmindful of the general rule that any uncertainties in a contract must be construed most strongly against the party who drafted it. Restatement (Second) of Contracts § 206 (1981); S[c]hultz & Lindsay Constr. Co. v. State, [83 N.M. 534, 494 P.2d 612 (1972)]. However, the terms of the employment contract as a whole, and certainly of the quoted paragraph, were ambiguous and uncertain. The parties' intentions were therefore properly gleaned from the conduct and language of the parties, the objectives sought to be accomplished, and the surrounding circumstances of the case.

Manuel Lujan Ins., Inc. v. Jordan, 100 N.M. at 576, 673 P.2d at 1309.  Given that this case was decided before New Mexico expressly jettisoned a formalistic approach to contract interpretation in Mark V, Inc. v. Mellekas and C.R. Anthony v. Loretto Mall Partners, these latter cases emphasizing the importance of extrinsic evidence reinforce Manuel Lujan Ins., Inc. v. Jordan's holding that a drafter does not automatically lose because a contract is ambiguous.

The sum of these cases is that the canon does not trump Mark V, Inc. v. Mellekas.  This result seems reasonable.  Construing a contract against the drafter is an off-the-shelf default rule -- a way of resolving warring interpretations of a contract when all else fails.  The primary goal of contract interpretation in New Mexico is "to ascertain and give effect to the intentions of the parties." Manuel Lujan Ins., Inc. v. Jordan, 100 N.M. at 575, 673 P.2d at 1308.  Discerning intent without resorting to formalistic rules accords well with New Mexico's policy.  It makes sense, then, to assign Mark V, Inc. v. Mellekas a higher place in the hierarchy of contract interpretation than the canon of construction.  Jarret Glasscock's approach would exclude a whole swath of cases -- any case with identifiable drafters -- from the reach of extrinsic evidence.  New Mexico case law does not support that result.  The canon of construction is not unimportant, but it must take a back seat

to the interpretation of the contract under <u>Mark V, Inc. v. Mellekas</u>.  Lingering ambiguities will properly be resolved against the drafter.  At this stage, however, with evidence of ambiguity and evidence supporting Israel's position, summary judgment is inappropriate even though she is the drafter of the Addendum.

## II.     THE COURT WILL NOT GRANT SUMMARY JUDGMENT TO JARRET GLASSCOCK ON THE BASIS OF KEITH GLASSCOCK'S MENTAL WEAKNESS.

Jarret Glasscock argues that the REPA and the Addendum are void contracts because Keith Glasscock signed them in a state of mental weakness and they are not perfectly fair.  As a threshold issue, the Court must resolve the parties' dispute over the governing law.  The Court concludes that the correct standard is the undue-influence standard, which requires Jarret Glasscock to show that Israel and Keith Glasscock were in a confidential relationship and that suspicious circumstances surround the challenged transaction to shift the burden to Israel, who then must show that the transaction was not procured through undue influence over Keith Glasscock.  There are genuine disputes of material facts on these issues that make summary judgment inappropriate here.

### A.     THE UNDUE INFLUENCE TEST IS THE CORRECT LEGAL STANDARD.

The parties present dueling standards to be applied here.  Jarret Glasscock urges the Court to apply <u>Morgan v. Thompson</u>, while Israel contends that more recent cases have superseded <u>Morgan v. Thompson</u>.  The course of the case law in New Mexico leads the Court to conclude that Israel is advancing the correct standard.

<u>Morgan v. Thompson</u> is a rather old case, and while Jarret Glasscock is correct that it has never been expressly overruled, overturned, or even questioned, it also has not been cited in a New Mexico state court since 1974.  <u>See</u> <u>Demers v. Gerety</u>, 87 N.M. 52, 54, 529 P.2d 278, 280 (Ct.App. 1974)(citing <u>Morgan v. Thompson</u>).  Moreover, even the handful of citations to <u>Morgan v.</u>

Thompson before 1974 do not apply the proposition for which Jarret Glasscock cites the case.  See, e.g., Demers v. Gerety, 87 N.M. at 54, 529 P.2d at 280 (citing Morgan v. Thompson as authority for incompetency at signing invalidating contract); Melfi v. Goodman, 73 N.M. 320, 324, 388 P.2d 50, 52-53 (1963)(discussing Morgan v. Thompson's apparent holding that a breach of contract absent a cancellation clause did not allow for termination of a contract).

Antiquity alone, of course, will not render a case bad law.  Morgan v. Thompson is also in tension, however, with more recent decisions from the New Mexico courts.  Israel points in particular to Gersbach v. Warren, which she touts as the "leading New Mexico undue influence decision."  Response at 18.  In Gersbach v. Warren, the Supreme Court of New Mexico stated:

> Undue influence is not "susceptible of any fixed formula."  Hummer v. Betenbough, 75 N.M. 274, 282, 404 P.2d 110, 116 (1965) (quoting Brown v. Cobb, 53 N.M. 169, 172, 204 P.2d 264, 266 (1949)). In fact, "New Mexico courts have refused to state a legal definition of undue influence."  Mary Catherine McCulloch, Comment, Undue Influence in Wills-Evidence-Testators' Position Changes After In re Will of Ferrill, 13 N.M.L.Rev. 753, 755-56 (1983) (characterizing the Court's analysis as avoiding "a blue print for the commission of a wrongful act"). We have, instead, "described the approach contestants must use to prove an undue influence claim." Id. at 755. We have held that a confidential relationship is required in order to support a determination of undue influence.  Hummer, 75 N.M. at 282, 404 P.2d at 116. In addition to a confidential relationship, however, suspicious circumstances must also exist.  Id. at 280, 404 P.2d at 114.

Gersbach v. Warren ¶ 8, 125 N.M. at 272, 960 P.2d at 814.  The Supreme Court of New Mexico went on to list some circumstances that could be suspicious:

> (1) old age and weakened physical or mental condition of testator; (2) lack of consideration for the bequest; (3) unnatural or unjust disposition of the property; (4) participation of beneficiary in procuring the gift; (5) domination or control over the donor by a beneficiary; and (6) secrecy, concealment, or failure to disclose the gift by a beneficiary.

Id. "This is not an exhaustive list, nor is it a list of circumstances that are always suspicious. Furthermore, the presence of any of these circumstances is not in itself dispositive."  Id.  The

Supreme Court of New Mexico also defined a confidential relationship: "A confidential or fiduciary relationship exists when one person places trust and confidence in the integrity and fidelity of another." Id. ¶ 11, 125 N.M. at 273, 960 P.2d at 815 (internal quotation marks omitted). The Supreme Court of New Mexico stated that the party challenging a transaction bore the burden of proving undue influence "by clear and convincing evidence." Id. ¶ 9, 125 N.M. at 272, 960 P.2d at 814. Ultimately, the question is whether the gift or transaction would occur "but for the undue influence exerted over" the party. Id. ¶ 8, 125 N.M. at 272, 960 P.2d at 814. Establishing a confidential relationship and suspicious circumstances raises a presumption of undue influence, shifting the burden to the party supporting a document to rebut the presumption. See id. While Gersbach v. Warren dealt specifically with a testamentary gift, it relied heavily on, and reiterated many of the rules of undue influence from, Montoya v. Torres, which involved a challenge to a deed. As cases like Gersbach v. Warren and Montoya v. Torres indicate, in the more recent New Mexico jurisprudence, mental weakness has been subsumed, under the broader undue-influence test, as a possible suspicious circumstance.

The standard that Jarret Glasscock urges, that mental weakness alone may void a contract and that a showing of such weakness shifts the burden to the contract's proponent to show perfect fairness, has been touched upon in other cases besides Morgan v. Thompson. In Hummer v. Betenbough, the most recent such case, the Supreme Court of New Mexico noted the language that "[i]t is undoubtedly the law that when, by physical or mental superiority, one obtains an advantage in a transaction over another who is enfeebled in mind and body, or by disease or old age, the person obtaining such advantage will be required to show that the transaction was a fair one." 75 N.M. at 282, 404 P.2d at 116 (internal quotation marks omitted). The Hummer v. Betenbough court, however, went on to find undue influence because of a host of factors, including a confidential

relationship and mental history.  See id.,75 N.M. at 282, 404 P.2d at 116.  Hummer v. Betenbough is one in the line of cases that has been relied on and ultimately led to the exposition of the undue influence test in Gersbach v. Warren and Montoya v. Torres.  New Mexico courts have thus occasionally -- although not recently -- mentioned the rule that Jarret Glasscock would have the Court adopt.  Notably, however, that rule has never actually been applied to decide a case.  Even in Morgan v. Thompson, the decision was that the mental weakness at issue was not severe enough to "totally destroy one's ability to understand the nature and effect of a contract," and no other inequitable conduct was present.  46 N.M. at 282, 1127 P.2d at 1041.  The Supreme Court of New Mexico thus reversed the finding that the appellee "was incompetent to make a valid contract."  Id. While New Mexico courts have mentioned the rule that Jarret Glasscock supports, they have never applied it.

The Court therefore believes that the undue-influence test explained in Gersbach v. Warren is the appropriate standard to apply to this situation.  The standard that Jarret Glasscock advocates has never been definitively applied to decide a case in New Mexico and has not even been mentioned recently.  Instead, New Mexico has developed a multifaceted and contextual undue-influence test.  It is the rules announced in these cases that have been applied to situations such as the one before the Court.  Although Jarret Glasscock argues that the cases Israel cites do not involve a defense of mental weakness, the Court does not see why a New Mexico court today would apply the old rule in Morgan v. Thompson when Gersbach v. Warren and other recent cases define mental weakness as a possible suspicious circumstance in the undue-influence calculus.

**B.     THE MATERIAL FACTS ARE IN GENUINE DISPUTE.**

Applying the undue-influence standard to the record before the Court, there are genuine issues of material fact that preclude summary judgment.  There are disputes whether Keith

Glasscock and Israel had a confidential relationship, whether there were suspicious circumstances, and ultimately whether Israel exercised undue influence over Keith Glasscock. The Court will not catalogue every factual dispute, but rather will note a few disputed areas that prevent the use of summary judgment here.[3]

Whether Keith Glasscock and Israel had a confidential relationship depends on whether Keith Glasscock placed "trust and confidence in the integrity and fidelity of" Israel. Gersbach v. Warren ¶ 11, 125 N.M. at 273, 960 P.2d at 815 (internal quotation marks omitted). Jarret Glasscock has offered significant evidence of the closeness of the relationship between Keith Glasscock and Israel. Israel counters that Keith Glasscock placed a significant amount of trust in others as well. For instance, Israel asserts that Jarret Glasscock was Keith Glasscock's successor trustee and personal representative. See Exhibit 5-B, Deposition of Robert Worcester at 25:15-22 (taken October 9, 2008)(Doc. 81-8). Israel also argues that she had little involvement with Keith Glasscock's finances, see Israel Aff. ¶ 10, at 3, that Keith Glasscock shared confidential information with others that was not shared with her, see id. ¶ 11, at 4, and that she was listed on his advance health-care directive only because she lived in Santa Fe, while Keith Glasscock thought his wife, who was allegedly a drug addict, was not a good choice for the task, see id. ¶ 12, at 4. While Jarret Glasscock has presented significant evidence of a confidential relationship, given Israel's rebuttal evidence, and drawing all inferences in her favor, the Court cannot say that it is undisputed that Keith Glasscock and Israel had a confidential relationship.

It is also not undisputed that Keith Glasscock was mentally weak when he signed the REPA

---

[3] The Court will also not address the many evidentiary objections Israel has made to evidence Jarret Glasscock offered in support of his motion. Because the Court finds that there are disputed issues requiring denial of the motion even if the Court admits all the evidence to which Israel objects, the Court will discuss all evidence presented without ruling on its admissibility.

and the Addendum.   While Jarret Glasscock has amassed evidence that Keith Glasscock was hallucinating and suffering from memory loss, Israel has contradictory evidence that Keith Glasscock was lucid.   Israel's affidavit indicates that, when he signed the agreements, "he was mentally alert as ever, . . . he was joking with the staff, and made his usual ironic, perceptive, and intelligent comments."   Israel Aff. ¶ 13, at 4.   According to Trujillo, a long-time friend of Keith, when Trujillo visited in September 2007, Keith Glasscock was "as mentally sharp as he had ever been," Trujillo Decl. ¶ 3, at 1, and nothing suggested to Trujillo that Keith Glasscock "had lost any of his mental ability," id. ¶ 4, at 2.   While Jarret Glasscock argues that Trujillo's observations were not on the day that Keith Glasscock signed the documents, Trujillo's comments nonetheless provide circumstantial evidence, just as a number of pieces of Jarret Glasscock's evidence do not address the precise time of the signing.   Jarret Glasscock also contends that Israel admitted in her deposition that Keith Glasscock was not back to normal when he signed.   Not back to normal and mentally weak, however, are not necessarily the same thing.   Moreover, tension between Israel's affidavit and deposition does not entail an admission that establishes a fact, but rather indicates that genuine factual disputes inappropriate for resolution on summary judgment remain.

In his Reply, Jarret Glasscock identifies several other possible suspicious circumstances that could apply under the undue-influence test beside mental weakness.   These areas, however, are also in dispute.   Jarret Glasscock argues that the way that Israel drafted the Addendum and got Keith Glasscock to sign deprived Keith Glasscock of his counsel's advice.   Israel states, though, that she discussed the Addendum's contents with Jarret and Keith Glasscock and that she discussed the general nature of the proposal with Mr. Worcester over the telephone, who told her to she could draft the document because there was not time for him to.   See Israel Aff. ¶ 9, at 3.   Drawing reasonable inferences in Israel's favor, a fact-finder at trial could conclude that Israel's actions did

not deprive Keith Glasscock of counsel.

Jarret Glasscock also points out the reduction in purchase price and elimination of consideration to Keith Glasscock as suspicious circumstances.  Again, however, Israel has presented evidence which would allow a reasonable fact-finder to conclude that the circumstances were not suspicious.  According to Israel, she provided consideration in the form of improvements, maintenance, taxes, and insurance, and the Addendum allowed the non-improved portions of the Alameda property to remain with Keith Glasscock's grandson, Jarret Glasscock, a situation Israel states she believed Keith Glasscock approved.  See Israel Aff. ¶¶ 9, 14 at 3, 4.  Whether such assertions hold up at trial is a separate matter; for summary judgment, Israel need only present evidence that creates a genuine dispute.

Moreover, even if the burden shifted to Israel, she has presented evidence from which a rational fact-finder could conclude that she did not exercise undue influence.  For example, Israel's assertions that she discussed ideas that later became the Addendum with Keith and Jarret Glasscock, and Israel's contention that Jarret Glasscock originated the idea of the Addendum, both support there being no undue influence.  See Israel Aff. ¶¶ 4-5, 9 & 17, at 2, 3 & 5.  Israel's statements that Keith Glasscock seemed normal when he signed the REPA and the Addendum also support a lack of undue influence.  At the summary-judgment stage, the burden shifting to Israel does not require her to prove the absence of undue influence, but only to introduce evidence that, if all reasonable inferences were drawn in her favor, would allow a rational fact-finder to conclude that there was no undue influence.  She has met that burden.

**IT IS ORDERED** that the Defendant's Motion for Summary Judgment is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Thomas A. Simons, IV
Faith Kalman Reyes
Simons & Slattery, LLP
Santa Fe, New Mexico

    *Attorneys for the Plaintiff*

Michael J. Moffett
Comeau, Maldegen, Templeman & Indall, LLP
Santa Fe, New Mexico

    *Attorneys for the Defendant*